[No. B150919. Second Dist., Div. Three. Apr. 29, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
UBALDO CERVANTES et al., Defendants and Appellants.

[CERTIFIED FOR PARTIAL PUBLICATION*]

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of Discussion parts 2. through 14.

**COUNSEL**

Christine Vento, under appointment by the Court of Appeal, for Defendant and Appellant Ubaldo Cervantes.

Mark D. Lenenberg, under appointment by the Court of Appeal; Marilee Marshall & Associates and Marilee Marshall for Defendant and Appellant Jose Martinez.

Andrew Levy, under appointment by the Court of Appeal, for Defendant and Appellant Cesar R. Morales.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KLEIN, P. J.**—Ubaldo Cervantes, Jose Martinez and Cesar R. Morales appeal the judgments entered after conviction by jury of first degree murder and attempted willful, deliberate and premeditated murder. (Pen. Code, §§ 187, 664.)[1] The jury that tried Morales and Cervantes, as well as the jury that tried

---

[1] Subsequent unspecified statutory references are to the Penal Code.

Martinez, found the offenses had been committed for the benefit of a criminal street gang and that a principal personally discharged a firearm causing death as to the murder count, and a principal personally discharged a firearm causing great bodily injury as to the attempted murder count. (§§ 186.22, subd. (b)(1), 12022.53, subds. (d) & (e)(1).) The jury that tried Martinez found he personally discharged a firearm in the commission of both counts. (§ 12022.53, subd. (c).) The trial court sentenced Martinez to a term of 84 years to life in state prison and sentenced Cervantes and Morales to terms of 80 years to life in state prison.

In the published portion of the opinion, we reject the claim that evidence of a statement made by Morales to his neighbor regarding the underlying incident should not have been presented at trial as against nondeclarants Cervantes and Martinez. In the unpublished portion of the opinion, we reject various other claims but modify the judgment as to Martinez to strike a two-year enhancement imposed as to count II and modify the judgment as to Cervantes to reflect a term of life with the possibility of parole in count II. In all other respects, the judgments are affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Prosecution's evidence.*

a. *The offenses.*

On January 2, 1999, at approximately 2:30 a.m., Schundra Estrada heard a car engine outside her residence on Loosmore Street in the Cypress Park area of Los Angeles. Estrada then heard footsteps of more than one person leaving the car, followed by approximately eight gunshots from around the corner on Pleasant View Avenue. Estrada next heard footsteps running to the car, car doors closing and more than one voice saying, "go, go, go, go." Estrada looked outside and saw a white Honda leave the scene. Estrada's boyfriend was on the telephone with the 911 operator as the Honda departed.

Police officers found Joey Valentino lying in a pool of blood on Pleasant View Avenue. Gustavo Alvarado was a few feet away. Both had been beaten about the face and shot in the head at a downward trajectory. Alvarado additionally had been shot in the back. One of Valentino's teeth had been knocked from his mouth. Valentino died as a result of the gunshot wound to the head. Alvarado lost an eye and remains paralyzed below the chest. Valentino and Alvarado were students at the time of the shooting and did not belong to a gang or carry weapons, and Valentino was in the Army Reserve.

Shortly after the shooting, Los Angeles police officers followed a white Honda that refused to yield. Two males ran from the passenger side of the Honda toward a California Department of Transportation (Caltrans) yard and evaded the officers. The driver, Juan Naranjo, remained seated in the Honda and was apprehended.[2] Martinez fled from the driver's side of the Honda. Shortly before the officers caught Martinez, he discarded a Glock nine-millimeter handgun. Martinez wore dark blue knit gloves and had a 30-round magazine clip for the Glock.

In a search of the Caltrans yard, officers found a TEC-9 handgun, a loaded magazine for that weapon, a .357 magnum handgun and a latex glove. Two blue gloves were found at the entrance of the yard. A blue knit cap and another pair of dark gloves were found near the yard.

A nine-millimeter Luger cartridge was found in the Honda. Cervantes's fingerprints were on the inside of the front passenger window of the Honda, which was registered to Morales. A hair fragment found on one of the knit caps shared 10 to 12 similarities, out of a possible 15, with Cervantes's hair. A bloodstain on the razor wire on top of the fence around the Caltrans yard contained Morales's DNA.

Seven expended shell casings were found at the scene of the attack, and five additional casings were found across the street. A criminalist testified the Glock had fired 10 of the 12 casings. The 11th casing could have been fired by the Glock but was not fired by the TEC-9. The 12th casing could have been fired from the TEC-9 but was not fired by the Glock.

b. *Statements by the defendants.*

(1) *Morales's statement to Dolores Ojeda.*

On January 2, 1999, at approximately 9:30 p.m., Dolores Ojeda, who worked as a surgical medical assistant, went across the street to the home of Morales. Ojeda had known Morales for approximately 12 years. Ojeda also knew Cervantes, Martinez and Naranjo. Ojeda's daughter dated Martinez for approximately 18 months. Ojeda spoke to Morales on the front porch of the residence. Morales had slashes and cuts on his hands which were swollen.

Morales told Ojeda he received the cuts "jumping fences." Morales said he had gone to a party the previous night in Cypress Park with Cervantes, Martinez and Naranjo to look for some males who had made advances toward Morales's girlfriend. Naranjo drove and stopped when they saw two males. Morales, Martinez and Cervantes questioned the two males about

---

[2] Naranjo, a codefendant at trial, is not a party to this appeal.

where they were from and asked them about a "girlfriend." The two males were held at gunpoint on their knees and said they did not know what Morales was talking about. Morales struck one of the males with his handgun and told Martinez to search the males for weapons. Martinez did not find a weapon but Morales said one of the males had a weapon. Morales shot one male because his "friend was lying." When the second male ran, Morales and Cervantes shot him. Morales, Cervantes and Martinez returned to the Honda and told Naranjo nothing had happened. Morales ran from the car after they were followed by the police and jumped a fence near a freeway. Morales also told Ojeda he thought the two males were the "wrong guys." Morales expressed fear he might lose his job as a security guard.

Ojeda telephoned the police on January 7, 1999, and reported what Morales had said to her. Ojeda knew Morales, Cervantes and Martinez were admitted gang members. Ojeda was afraid to testify in this case.

### (2) *Martinez's statement to Detective Teague.*

On January 4, 1999, Martinez waived his rights per *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L. Ed. 2d 694, 86 S. Ct. 1602], and gave Los Angeles Police Detective Andrew Teague a statement that Teague reduced to writing and Martinez signed. Only the jury that tried Martinez heard evidence of this statement. Martinez told Teague he had been a gang member for about one year. Martinez finished work at approximately 1:00 a.m. on January 2, 1999, and went driving with Morales and Cervantes into the territory of another gang in Cypress Park. Morales had a Glock handgun in his waistband and produced a TEC-9 from under the driver's seat and gave it to Martinez. Cervantes had a .357 revolver. As they exited the freeway, Morales said they were "going to get some fools from Cypress" and that it was "personal." Morales drove directly to the scene of the assault and said, "They will be there. They always kick it there." When they stopped, Morales exited the car and told Naranjo to drive. Morales, Cervantes and Martinez, armed with the Glock, the .357 and the TEC-9, respectively, crossed the street and waited until they saw three males exit a car, which then drove off. One of the males entered a house. Morales and Cervantes crept toward the two remaining males while Martinez acted as a lookout. Morales confronted the males and questioned them about a female. One of the males denied involvement with the female. Morales struck the two males. Martinez heard gunshots and, when Morales and Cervantes retreated to Martinez's location, Martinez fired three or four rounds into the air to dissuade anyone from chasing them. In the Honda, Morales traded guns with Martinez.

Teague testified as an expert on gangs that appellants drove "to the heart of a . . . rival's territory," armed with a "high-powered weapons." These facts,

combined with Morales's statement they were going to "get some fools," in Teague's opinion, meant "they are going to shoot somebody. And when you shoot somebody in a gang, you . . . are shooting to kill."

### c.  *Other evidence.*

When he was arrested on January 4, 1999, Morales had two lacerations on the palm of his right hand and the knuckles of his left hand were swollen and bruised. That same day, Officer Jose Carrillo observed a long cut across Cervantes's chest and several small cuts on his arms.

In June 1998, Morales told Los Angeles Police Officer Jose Vasques that he used a nine-millimeter Glock handgun in his work as a security guard.

Ana Barraza testified that at the time of the shooting, she was dating Morales and that she had been threatened by the father of her child, Adrian Flores, a member of a Cypress Park gang. Approximately five months after the shooting in this case, Flores abducted Barraza from a residence on Pleasant View Avenue.

### d.  *Gang expert testimony.*

Officer Gustavo Camacho testified Martinez, Cervantes and Morales each had admitted membership in their gang, the gang claimed territory in the Hollenbeck area near East Los Angeles, it had about 40 members at the time of this offense and members identified themselves with the initials of the gang's name. The primary activities of the gang are narcotics sales, vandalism, assaults, carjackings and robberies. Gang members earn respect within the gang by participating in these activities. Appellants' gang and Flores's gang were not traditional rivals. Camacho opined that when gang members exit a car with loaded firearms in the territory of another gang, it is reasonably foreseeable that someone is going to be shot. Shootings committed in the territory of another gang would benefit appellants' gang by earning the gang respect.

### 2.  *Defense evidence.*

Cervantes presented evidence indicating he lived next door to Morales and that he had been a passenger in Morales's Honda on numerous occasions, the last being two or three months before January 2, 1999.

### 3.  *Sentencing considerations.*

The trial court sentenced Morales and Cervantes each to a term of 25 years to life, plus a 20-year enhancement pursuant to section 12022.53, subdivisions (c) and (e)(1), for discharge of a firearm by a principal causing death as

to count I and a consecutive term of 15 years to life in state prison, plus a 20-year enhancement pursuant to section 12022.53, subdivisions (c) and (e)(1), for discharge of a firearm by a principal causing great bodily injury as to count II for a total term a term of 80 years to life in state prison. The trial court sentenced Martinez to the same terms but enhanced each count by a consecutive two-year term for the criminal street gang enhancement pursuant to section 186.22, subdivision (b)(1), for a total term of 84 years to life in state prison.

## CONTENTIONS

Cervantes and Martinez contend Morales's statement to Ojeda should have been excluded from evidence, the statement was insufficiently corroborated, and the trial court committed numerous instances of instructional and sentencing error. All three appellants contend the trial court erroneously failed to modify CALJIC No. 2.20 to include immunized testimony.

Morales and Cervantes contend the criminal street gang enhancement must be set aside because it was not charged in the information. Cervantes contends the evidence was insufficient to support the criminal street gang enhancement and the cumulative effect of the trial court's errors requires reversal. Morales contends the evidence is insufficient to support the convictions.[3]

Martinez contends the term imposed constitutes cruel and unusual punishment and the trial court erroneously refused to permit impeachment of Detective Teague with a prior instance of official misconduct. Martinez asks this court to review the trial court's in camera rulings on a pretrial discovery motion.

Each appellant joins in any issue raised by a co-appellant that might accrue to appellant's benefit.

## DISCUSSION

1. *The trial court properly admitted evidence of Morales's statement to Ojeda.*

    a. *Ojeda's statement; the trial court's ruling.*

The initial statement Ojeda recounted to the police differed from her testimony at trial. Ojeda initially told the police that Morales said Cervantes

---

[3] Morales also raises other claims that plainly are inapplicable to this case. In the interest of brevity, we omit further reference to these contentions. If Morales believes any of his claims erroneously have been overlooked, he may seek rehearing.

shot the first male and Morales and Cervantes shot the second male who ran. In other respects, Ojeda's statement to the police conformed to her trial testimony.

In a written pretrial ruling, relying upon *People v. Greenberger* (1997) 58 Cal.App.4th 298 [68 Cal.Rptr.2d 61] (*Greenberger*), the trial court found Ojeda's testimony admissible as against Morales's penal interest and found "sufficient indicia of trustworthiness and reliability to overcome the [confrontation clause] objections."

The trial court wrote: "Morales actively sought out his neighbor Dolores Ojeda for medical treatment outside the normal avenues, in all likelihood due to the manner in which the injuries were suffered. There is no indication Ojeda had any connection with any law enforcement agency or that she was operating as an agent for any law enforcement agency. Ojeda's simple question of what happened was relevant to the medical treatment she rendered and it was more than natural in the course of human nature. Ojeda's curiosity is even more understandable in light of the fact she was also acquainted with the other participants. [¶] One major concern in *Greenb[e]rger* statements [*Greenberger, supra,* 58 Cal.App.4th 298] like this is that the declarant seeks to minimize his or her participation or seeks to shift the blame to another. Morales does identify two of his co-defendants as the persons who actually discharged firearms at the victims, thereby allocating for himself a lesser role; however, his statement that, 'We shot at the guy . . .' is an acknowledgement of his equal level of culpability."

The trial court found, based on the totality of the circumstances, Ojeda's testimony was admissible as against Morales's penal interest and found the statement also had "sufficient indicia of trustworthiness and reliability to overcome [appellants'] objections."

b. *Appellants' contention.*

Cervantes and Martinez contend admission of Ojeda's testimony violated their right to confront and cross-examine Morales. Cervantes and Martinez claim Morales's statement was inherently untrustworthy and presumptively unreliable because Morales tried to place the majority of the blame on Cervantes, especially in the first version of the statement. Cervantes argues the change in Ojeda's testimony suggests the statement lacked reliability and the circumstances under which the statement was made refute the trial court's finding of trustworthiness.

Appellants note Morales knew he was in "deep trouble" when he made the statement because Martinez and Naranjo had been arrested and Morales's

Honda had been seized. Morales tried to shift blame by indicating Martinez searched the victims and Cervantes shot the second victim. Cervantes argues Morales increased the likelihood Ojeda would repeat the statement to the police by telling her that Martinez, the boyfriend of Ojeda's daughter, was a reluctant participant who did not shoot either victim. The statement also attempts to place Morales in a more sympathetic light by suggesting the shooting was a mistake or justified because the victims had weapons. All of these factors indicate lack of trustworthiness.

Appellants also argue Ojeda's testimony should have been limited to statements specifically disserving only to Morales. (*People v. Duarte* (2000) 24 Cal.4th 603, 612 [101 Cal.Rptr.2d 701, 12 P.3d 1110].) Appellants claim admission of accomplice hearsay that implicates a codefendant does not fall within any "firmly rooted" exception to the hearsay rule and lacks trustworthiness. (*Lilly v. Virginia* (1999) 527 U.S. 116, 134 [144 L.Ed.2d 117, 119 S.Ct. 1887].) Cervantes and Martinez also contend the statement should have been redacted, pursuant to *Aranda/Bruton* (*People v. Aranda* (1965) 63 Cal.2d 518, 529–530 [47 Cal.Rptr. 353, 407 P.2d 265]; *Bruton v. United States* (1968) 391 U.S. 123, 126–137 [20 L.Ed.2d 476, 88 S.Ct. 1620]), to eliminate reference to them.

Cervantes claims the error was especially prejudicial to him because Morales's statement was the only evidence connecting Cervantes to the shooting.

Martinez asserts prejudice because Martinez admitted to Teague only that he acted as a lookout whereas Morales told Ojeda that Martinez searched the victims immediately before they were shot. Martinez concludes Morales's statement must have contributed to the jury's finding with respect to the degree of the murder and the finding of premeditation on the attempted murder count. (See *Arizona v. Fulminante* (1991) 499 U.S. 279, 295–296, 302 [113 L.Ed.2d 302, 111 S.Ct. 1246].)

c. *Applicable law.*

In *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), the United States Supreme Court established new rules for determining whether a criminal defendant's constitutional right to confront witnesses is violated.

Prior to *Crawford,* the admission of an unavailable witness's statement against a criminal defendant was governed by the well-settled rule of *Ohio v. Roberts* (1980) 448 U.S. 56, 66 [65 L. Ed. 2d 597, 100 S. Ct. 2531]. *Roberts* held such statements could be admitted at trial only when (1) "the evidence

falls within a firmly rooted hearsay exception" or (2) the statements contain "particularized guarantees of trustworthiness" such that adversarial testing would add little to the statements' reliability. (*Ibid.*)[4]

Thereafter, *Lilly v. Virginia, supra,* 527 U.S. at page 134 held "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence."

Thus, prior to *Crawford,* the admissibility of an out of court statement by an unavailable witness as substantive evidence against a criminal defendant turned on whether the statement contained "particularized guarantees of trustworthiness" such that adversarial testing would add little to its reliability.

■    *Crawford* replaced this test with a new focus on the "testimonial or nontestimonial nature" of the out-of-court statement. *Crawford* held that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." (*Crawford, supra,* 541 U.S. at pp. 68–69 [124 S.Ct. at p. 1374].) Thus, out-of-court *testimonial* statements are admissible only when the witness is unavailable and there has been a prior opportunity for cross-examination of that witness.

*Crawford* declined to define the term "testimonial" (*Crawford, supra,* 541 U.S. at p. 53 [124 S.Ct. at p. 1375]), but gave examples of testimonial statements. *Crawford* listed as testimonial: (1) plea allocutions showing the existence of a conspiracy; (2) grand jury testimony; (3) prior trial testimony; (4) ex parte testimony at a preliminary hearing; and (5) statements taken by police officers in the course of interrogations. (*Crawford, supra,* 541 U.S. at pp. 52–66 [124 S.Ct. at pp. 1364–1372]). Crawford observed these modern practices were close kin to the abuses at which the confrontation clause was directed. (*Crawford, supra,* 541 U.S. at p. 68 [124 S.Ct. at p. 1364].)[5]

*Crawford* also offered illustrations of statements that could be considered " 'testimonial' " drawn from the briefs submitted in the case. These included:

---

[4] The "firmly rooted" exceptions to the hearsay rule include (1) statements by a coconspirator during and in furtherance of the conspiracy, *Bourjaily v. United States* (1987) 483 U.S. 171, 183–84 [97 L.Ed.2d 144, 107 S.Ct. 2775]; (2) excited utterances, *White v. Illinois* (1992) 502 U.S. 346, 356–357 [116 L.Ed.2d 848, 112 S.Ct. 736]; and (3) statements made for purpose of obtaining medical treatment. (*Ibid.*)

[5] *Crawford* noted some statements admissible as exceptions to the hearsay rule were not testimonial in nature, such as business records or statements in furtherance of a conspiracy (*Crawford, supra,* 541 U.S. at p. 59 [124 S.Ct. at p. 1369]), and left open the question whether the Sixth Amendment incorporated an exception for testimonial dying declarations (*Id.* at p. 56, fn. 6 [124 S.Ct. at p. 1367, fn. 6]).

(1) " 'ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [quoting] Brief for Petitioner [Crawford at page] 23; [and (2)] . . . 'statements . . . made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial,' [quoting] Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* [at page] 3." (*Crawford, supra,* 541 U.S. at pp. 51–52 [124 S.Ct. at p. 1364].)

*Crawford* recognized that if the statement in issue is nontestimonial, the rules of evidence, including hearsay rules, apply. *Crawford* stated: "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . ." (*Crawford, supra,* 541 U.S. at p. 68 [124 S.Ct. at p. 1374].) Thus, state courts may consider "reliability factors beyond prior opportunity for cross-examination when the hearsay statement at issue was not testimonial. [Citation.]" (*Id.* at p. 57 [124 S.Ct. at p. 1368].)

With these principles in mind, we turn to the facts of this case.

d. *Morales's statement was not testimonial.*

Because *Crawford* applies only to "testimonial statements," we must first determine whether Morales's statement falls into that category. If the statements are testimonial, the only acceptable indicia of reliability is confrontation. If the statements were nontestimonial, then we may consider whether they can be admitted consistent with the hearsay rules of evidence. We necessarily address this issue de novo in that the testimonial/nontestimonial distinction was not a concern at the time of trial.

Initially, it appears clear that Morales's statement is not similar to the primary examples of testimonial statements given in *Crawford,* namely, grand jury testimony, prior trial testimony, ex parte testimony at a preliminary hearing, or statements taken by police officers in the course of interrogations. (*Crawford, supra,* 541 U.S. at p. 51 [124 S.Ct. at p. 1364].)

Morales's statement was testimonial, if at all, only under the definition quoted from the amici curiae brief filed by the National Association of Criminal Defense Lawyers et al., which asserted testimonial statements include those " 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . .' " (Crawford, supra, 541 U.S. at p. 52 [124 S.Ct. at p. 1364].)

Under this definition, Morales's statement is testimonial if a reasonable person in Morales's position would believe the statement would be available for use at a trial.

Martinez and Cervantes argue Morales made the statement to Ojeda knowing she would repeat it to the police, as she eventually did.[6] However, we do not find this view of the evidence reasonable. Rather, we subscribe to the view that Morales sought medical assistance from a friend of long standing who had come to visit his home. Morales's statement appears to have been made without any reasonable expectation it would be used at a later trial. Rather, it seems far more likely Morales expected Ojeda would not repeat anything he told her to the police. Indeed, Ojeda admitted she knew appellants were gang members and indicated she was afraid to testify in this case.

■ We find Morales did not reasonably anticipate the statement would be used at trial. Therefore, Morales's statement was not "testimonial" within the meaning of *Crawford* and indicia of reliability other than the opportunity for cross-examination, such as those the trial court applied here, are constitutionally permissible.

### e. *The trial court properly admitted Morales's statement as against Cervantes and Martinez.*

Having found Morales's statement is not testimonial in nature, we now apply the rules governing admissibility of nontestimonial statements to determine whether the statement falls within a well-settled hearsay exception or bears sufficient indicia of trustworthiness so as to render it admissible as against Cervantes and Martinez. At this juncture, the *Greenberger* analysis employed by the trial court again becomes applicable.

Before turning to the case at hand, we note there is some disagreement as to whether the trial court's ruling on this issue should be reviewed for an abuse of discretion or de novo. Although *Greenberger* applied an abuse of discretion standard in determining whether the trustworthiness test is satisfied, we conclude it is appropriate to conduct a de novo review of the totality of the circumstances that surround the making of the statement. (See *Lilly v. Virginia, supra*, 527 U.S. at pp. 136–137; *People v. Schmaus* (2003) 109

---

[6] Although appellants did not have the benefit of *Crawford, supra*, 541 U.S. 36 [124 S.Ct. 1354] prior to submission of this case for decision, their argument that Morales's statement was not reliable under *Ohio v. Roberts, supra*, 448 U.S. 56 directly addresses the factors to be considered in determining whether Morales's statement to Ojeda was testimonial in nature. Because the briefs submitted by the parties argue relevantly to the testimonial issue, we declined to invite further briefing from the parties.

Cal.App.4th 846, 856 [135 Cal.Rptr.2d 521]; *People v. Eccleston* (2001) 89 Cal.App.4th 436, 445–446 [107 Cal.Rptr.2d 440]; but see *People v. Brown* (2003) 31 Cal.4th 518, 535–536 [3 Cal.Rptr.3d 145, 73 P.3d 1137]), which reviewed a statutory trustworthiness finding for abuse of discretion.)

*Greenberger* summarized the law to be applied as follows: "There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. [Citations.]" (*Greenberger, supra,* 58 Cal.App.4th at p. 334.)

*Greenberger* noted: "Clearly the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others. '[O]nce partners in crime recognize that the 'jig is up,' they tend to lose any identity of interest and immediately become antagonists, rather than accomplices.' (*Lee v. Illinois* [(1986)] 476 U.S. [530,] 544 [90 L.Ed.2d 514, 106 S.Ct. 2056].) However, the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures. [Citations.]" (*Greenberger, supra,* 58 Cal.App.4th at p. 335.)

The evidence here showed Morales made the statement within 24 hours of the shooting to a lifelong friend from whom he sought medical treatment for injuries sustained in the commission of the offenses. Further, it is likely Morales wanted to have his wounds treated without going to the hospital. Regarding the content of the statement, Morales did attribute blame to Cervantes and Martinez but accepted for himself an active role in the crimes and described how he had directed the activities of Martinez. Thus, Morales's statement specifically was disserving of his penal interest because it subjected him to the risk of criminal liability to such an extent that a reasonable person in his position would not have made the statement unless he believed it to be true.

We also disagree with appellants' assertion the statement attempts to place Morales in a sympathetic light by suggesting the shooting was a mistake or justified because the victims had weapons. The fact appellants shot innocent victims, rather than the gang members they sought, does not render them more sympathetic. In either case, appellants were lying in wait for the victims to arrive, ambushed them, ordered them to their knees, searched and pistol-whipped them, then shot them. Nothing about the shooting as recounted by Morales suggested he should be considered a sympathetic figure or that he acted in self-defense.

Cervantes makes much of the fact that at the time the trial court made its ruling, it was under the impression Ojeda would testify Morales said Cervantes shot the first male. Cervantes argues this statement is much less incriminating than the version Ojeda related at trial. Cervantes suggests this court should review the trial court's ruling based on the evidence as it was known at the time of the ruling.

■ We normally review a trial court's ruling based on the facts known to the trial court at the time of the ruling. (See *People v. Box* (2000) 23 Cal.4th 1153, 1195 [99 Cal.Rptr.2d 69, 5 P.3d 130].) However, where we conduct de novo review, it is appropriate to consider all relevant facts, including those adduced at trial. However, even taking the discrepancies in the statement into account, we conclude the statement was trustworthy.

Ojeda consistently reported that Morales admitted shooting at the second male with Cervantes. The statement Cervantes shot the first male, as well as the statement Morales shot at the second male, both incriminated Morales because Morales was acting in concert with Cervantes at all relevant times. Thus, the discrepancies in the statement as repeated by Ojeda do not preclude a finding the statement was trustworthy.

■ Regarding the claim the statement should have been redacted to exclude reference to the nondeclarants, *Greenberger* specifically held this is not required where the statement admitted into evidence is disserving to the interests of the declarant. We agree with *Greenberger's* analysis on this point.

*Greenberger* observed: "*Bruton* does not stand for the proposition that all statements of one defendant that implicate another may not be introduced against all defendants in a joint trial. The *Bruton* opinion itself stated that the offending hearsay statement *in that case was clearly inadmissible against the nondeclarant* under traditional rules of evidence, and that there was no recognized exception to the hearsay rule for its admission." (*Greenberger, supra,* 58 Cal.App.4th at p. 332.)

*Greenberger* continued: "Since declarations against interest may be admitted in evidence without doing violence to the confrontation clause, we see no reason why such declarations, when made by a codefendant, should not also be admissible. This is not to say that all statements which incriminate the declarant and implicate the codefendant are admissible. Any such statement must satisfy the statutory definition of a declaration against interest and likewise satisfy the constitutional requirement of trustworthiness. This necessarily requires a 'fact-intensive inquiry, which would require careful examination of all the circumstances surrounding the criminal activity involved; . . .' (*Williamson v. United States* [(1994)] 512 U.S. [594,] 604 [129 L.Ed.2d 476,

114 S.Ct. 2431].) There is nothing in *Bruton* which prohibits introduction of such evidence." (*Greenberger, supra,* 58 Cal.App.4th at p. 332.)

██ *Greenberger* concluded "that a declaration against interest may be admitted in a joint trial so long as the statement satisfies the statutory definition and otherwise satisfies the constitutional requirement of trustworthiness. " (*Greenberger, supra,* 58 Cal.App.4th at p. 334.) Because we find Morales's statement qualified as a declaration against interest and satisfied the constitutional standard of trustworthiness, the trial court did not err in admitting evidence of the statement at appellants' trial.

We also reject appellants' suggestion *Greenberger* wrongly removed a limitation that previously had been placed on declarations against interest. *Greenberger* noted several prior cases had held that even where a declaration qualifies as one against the declarant's penal interest, it must be excluded if it goes to the heart of the case or it is crucial or devastating to the defense. (See *People v. Coble* (1976) 65 Cal.App.3d 187, 195 [135 Cal.Rptr. 199].) *Greenberger* disagreed with this line of cases.

Given the absence of any mention of *Coble's* rationale in the recent decisions of the United States and California Supreme Courts in this area, we decline to revisit this aspect of *Greenberger* and reject appellants' claim.

In conclusion, independent review satisfies us that Morales's statement to Ojeda was "so trustworthy that adversarial testing would add little to its reliability . . . ." (*Idaho v. Wright* (1990) 497 U.S. 805, 821 [111 L.Ed.2d 638, 110 S.Ct. 3139]; See also, *People v. Duke* (1999) 74 Cal.App.4th 23, 29–30 [87 Cal.Rptr.2d 547], citing *Lilly v. Virginia, supra,* 527 U.S. at pp. 124–125.) Thus, no violation of the Sixth Amendment right of confrontation appears.

2.–14.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment as to Cervantes is ordered modified with respect to count II to reflect a term of life with the possibility of parole. In all other respects, the judgment is affirmed.

The judgment as to Martinez is ordered modified with respect to count II to strike the two-year determinate term attributable to the criminal street gang

---

*See footnote, *ante,* page 162.

enhancement and to reflect a minimum term before parole eligibility of 15 years. In all other respects, the judgment is affirmed.

The judgment as to Morales is affirmed.

As to Cervantes and Martinez, the clerk of the superior court shall prepare and forward to the Department of Corrections amended abstracts of judgment.

Kitching, J., and Aldrich, J., concurred.

Appellants' petitions for review by the Supreme Court were denied August 11, 2004.