Filed 5/20/24  P. v. Morales CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CESAR MORALES,<br><br>Defendant and Appellant. | B325035<br><br>(Los Angeles County<br>Super. Ct. No. BA179633) |

APPEAL from an order of the Superior Court of Los Angeles County, Michael E. Pastor, Judge.  Affirmed.

Susan Morrow Maxwell, under appointment by the Court of Appeal,  for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

In 2001, a jury convicted Cesar Morales of first degree murder and of attempted murder. Years later, he petitioned for resentencing under Penal Code[1] section 1172.6, which limited accomplice liability for murder. After holding an evidentiary hearing under that section, the trial court found there was insufficient evidence Morales harbored express malice/intent to kill. It accordingly reduced the attempted murder conviction to assault with a firearm and resentenced Morales on that conviction. As to the first degree murder conviction, the trial court found that section 1172.6 did not permit it to reduce the conviction to second degree murder and to resentence him. Morales appeals, contending that the trial court misapplied the law concerning second degree implied malice murder, there was insufficient evidence he committed that crime, and section 1172.6 does allow trial courts to reduce the degree of murder. We reject these contentions and affirm the order.

## BACKGROUND

I.      Evidence from Morales's criminal trial

Morales, Ubaldo Cervantes, Jose Martinez, and Juan Naranjo were jointly tried for the murder of Joey Valentino and the attempted murder of Gustavo Alvarado.[2] We take some of the background from the Court of Appeal opinion affirming the judgments of conviction against Morales and Cervantes, *People v. Cervantes* (2004) 118 Cal.App.4th 162.

---

[1]      All further undesignated statutory references are to the Penal Code.

[2]      The trial had two juries, one for Martinez and a second for Morales, Cervantes, and Naranjo.

2

"On January 2, 1999, at approximately 2:30 a.m., Schundra Estrada heard a car engine outside her residence on Loosmore Street in the Cypress Park area of Los Angeles. Estrada then heard footsteps of more than one person leaving the car, followed by approximately eight gunshots from around the corner on Pleasant View Avenue. Estrada next heard footsteps running to the car, car doors closing and more than one voice saying, 'go, go, go, go.' Estrada looked outside and saw a white Honda leave the scene. . . .

"Police officers found Joey Valentino lying in a pool of blood on Pleasant View Avenue. Gustavo Alvarado was a few feet away. Both had been beaten about the face and shot in the head at a downward trajectory. Alvarado additionally had been shot in the back. One of Valentino's teeth had been knocked from his mouth. Valentino died as a result of the gunshot wound to the head. Alvarado lost an eye and remains paralyzed below the chest.[3] Valentino and Alvarado were students at the time of the shooting and did not belong to a gang or carry weapons, and Valentino was in the Army Reserve.

"Shortly after the shooting, Los Angeles police officers followed a white Honda that refused to yield. Two males ran from the passenger side of the Honda toward a California Department of Transportation (Caltrans) yard and evaded the officers. The driver, Juan Naranjo, remained seated in the Honda and was apprehended. Martinez fled from the driver's side of the Honda. Shortly before the officers caught Martinez, he

---

[3]  Alvarado testified at trial that he could not remember anything about the shooting.

3

discarded a nine-millimeter Glock handgun.  Martinez wore dark blue knit gloves and had a 30-round magazine clip for the Glock.

"In a search of the Caltrans yard, officers found a TEC-9 handgun, a loaded magazine for that weapon, a .357 magnum handgun and a latex glove.  Two blue gloves were found at the entrance of the yard.  A blue knit cap and another pair of dark gloves were found near the yard.

"A nine-millimeter Luger cartridge was found in the Honda.  Cervantes's fingerprints were on the inside of the front passenger window of the Honda, which was registered to Morales.  A hair fragment found on one of the knit caps shared 10 to 12 similarities, out of a possible 15, with Cervantes's hair.  A bloodstain on the razor wire on top of the fence around the Caltrans yard contained Morales's DNA.

"Seven expended shell casings were found at the scene of the attack, and five additional casings were found across the street.  A criminalist testified the Glock had fired 10 of the 12 casings.  The 11th casing could have been fired by the Glock but was not fired by the TEC-9.  The 12th casing could have been fired from the TEC-9 but was not fired by the Glock." (*People v. Cervantes*, *supra*, 118 Cal.App.4th at pp. 165–166, fn. omitted.)

Statements Morales made to Dolores Ojeda[4] were also introduced at his trial as follows:

"On January 2, 1999, at approximately 9:30 p.m., Dolores Ojeda, who worked as a surgical medical assistant, went across the street to the home of Morales.  Ojeda had known Morales for approximately 12 years.  Ojeda also knew Cervantes, Martinez

---

[4]     The defense impeached Ojeda with evidence that she was a bigamist.

4

and Naranjo.  Ojeda's daughter dated Martinez for approximately 18 months.  Ojeda spoke to Morales on the front porch of the residence.  Morales had slashes and cuts on his hands which were swollen.

"Morales told Ojeda he received the cuts 'jumping fences.'  Morales said he had gone to a party the previous night in Cypress Park with Cervantes, Martinez and Naranjo to look for some males who had made advances toward Morales's girlfriend.  Naranjo drove and stopped when they saw two males.  Morales, Martinez and Cervantes questioned the two males about where they were from and asked them about a 'girlfriend.'  The two males were held at gunpoint on their knees and said they did not know what Morales was talking about.  Morales struck one of the males with his handgun and told Martinez to search the males for weapons.  Martinez did not find a weapon but Morales said one of the males had a weapon.  Morales shot one male because his 'friend was lying.'  When the second male ran, Morales and Cervantes shot him.  Morales, Cervantes and Martinez returned to the Honda and told Naranjo nothing had happened.  Morales ran from the car after they were followed by the police and jumped a fence near a freeway.  Morales also told Ojeda he thought the two males were the 'wrong guys.'  Morales expressed fear he might lose his job as a security guard." (*People v. Cervantes*, *supra*, 118 Cal.App.4th at pp. 166–167.)[5]

---

[5]     Martinez gave a statement to law enforcement that was read only to his jury.  Martinez's statement essentially aligned with Ojeda's, claiming he did not shoot either victim, Morales shot Valentino, and Morales and Cervantes shot Alvarado.

When he was arrested on January 4, 1999, Morales had two lacerations on the palm of his right hand and the knuckles of his left hand were swollen and bruised. Cervantes had a long cut across his chest and several small cuts on his arms.

In 1998, before the crimes at issue occurred, Morales had told a police officer that he used a nine millimeter Glock handgun in his work as a security guard.

Ana Barraza testified that at the time of the shooting, she was dating Morales and that her child's father, a member of a Cypress Park gang, had threatened her.

A gang expert testified at trial that Martinez, Cervantes and Morales each had admitted membership in the same gang. The expert further testified that gang members earn respect within the gang by participating in certain criminal activities and that when gang members exit a car with loaded firearms in another gang's territory, it is reasonably foreseeable that someone is going to be shot. Shootings committed in another gang's territory would benefit Morales's gang by earning it respect.

II.     Jury's verdict and sentence

Morales's jury was instructed on the natural and probable consequences doctrine with CALJIC No. 3.02, with assault with force likely to cause great bodily injury or assault with a firearm as the target offenses. The jury found Morales guilty of first degree murder and premeditated, willful, and deliberate attempted murder. As to both counts, the jury found true principal gun use (§§ 12022.5, subd. (a)(1), 12022.53, subds. (b), (c), (d) & (e)(1)) and gang (§ 186.22, subd. (b)(1)) allegations. The jury found not true allegations that Morales personally used a

6

firearm and personally inflicted great bodily injury on the victims.[6]

In 2001, the trial court sentenced Morales to 25 years to life plus 20 years for the murder count and to life with a 15-year minimum parole eligibility plus 20 years for the attempted murder.

III.    The petition for resentencing and evidentiary hearing

In 2019, Morales petitioned for resentencing under section 1172.6.  The trial court found that Morales had stated a prima facie case for relief, appointed counsel to represent Morales, issued an order to show cause, and held an evidentiary hearing in June 2022.[7]

At the evidentiary hearing, the parties did not introduce new or additional evidence.  The trial court instead reviewed the reporter's transcript from Morales's criminal trial and heard argument.  It then found, as to both the murder and attempted murder counts, that there was insufficient evidence Morales acted with express malice.  However, as to count 1 for murder, the trial court found beyond a reasonable doubt that he would be convicted of second degree murder under current law.  The trial court based its finding on the "use of a family vehicle, . . . , the awareness of weapons, the motive, a dual motive of significance because of jealousy and also his gang associations[,] [h]is ordering that the vehicle be driven.  His being involved, . . . , with the

---

[6]    As to both counts, Martinez's jury found that he personally discharged a firearm (§ 12022.53, subd. (c)).

[7]    The evidentiary hearing also considered a petition for resentencing filed by Cervantes.

7

planning and preparation." Further, Morales wore gloves and fled with the other defendants. Thus, Morales's actions "demonstrate his subjective awareness of the dangers of his actions and the very real awareness of the risk to human life . . . in terms of his mens rea." Finding that section 1172.6 did not allow it to reduce the degree of murder, the trial court did not resentence Morales on his first degree murder conviction.

But the trial court reduced the attempted murder count to assault with a semiautomatic firearm and resentenced Morales to eight years in prison. The trial court also struck the gang enhancement as to that count.

## DISCUSSION

I.     Overview of Senate Bill No. 1437

To the end of ensuring a person's sentence is commensurate with the person's individual criminal culpability, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) limited accomplice liability under the felony-murder rule, eliminated the natural and probable consequences doctrine as it relates to murder, and eliminated convictions for murder based on a theory under which malice is imputed to a person based solely on that person's participation in a crime. (See generally *People v. Reyes* (2023) 14 Cal.5th 981, 986 (*Reyes*); *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843, superseded by statute on other grounds as stated in *People v. Birdsall* (2022) 77 Cal.App.5th 859, 866, fn. 19.) Senate Bill 1437 added section 189, subdivision (e) (limiting application of the felony-murder rule) and section 188, subdivision (a)(3) (stating that "to be convicted of murder, a principal in a crime shall act with malice aforethought" and malice "shall not be

8

imputed to a person based solely on his or her participation in a crime"). As amended by Senate Bill No. 775, effective January 1, 2022, these ameliorative changes to the law now expressly apply to attempted murder and voluntary manslaughter.

Senate Bill 1437 also created a procedure, codified in section 1172.6, for a person convicted of murder, attempted murder, or voluntary manslaughter under the former law to be resentenced if the person could no longer be convicted of those crimes under current law. (*People v. Lewis*, *supra*, 11 Cal.5th at p. 959; *People v. Gentile*, *supra*, 10 Cal.5th at p. 847.) A defendant commences that procedure by filing a petition containing a declaration that, among other things, the defendant could not presently be convicted of murder, attempted murder, or voluntary manslaughter under current law. (*People v. Strong* (2022) 13 Cal.5th 698, 708.) If a petition establishes a prima facie case for relief, the trial court must appoint counsel if requested, issue an order to show cause, and hold an evidentiary hearing at which the prosecution bears the burden of proving beyond a reasonable doubt that the petitioner is guilty of murder under the law as amended by Senate Bill 1437. (§ 1172.6, subds. (b)(3), (c), & (d)(1).) At the section 1172.6, subdivision (d)(3) evidentiary hearing, the parties may offer new or additional evidence. The trial court sits as an independent factfinder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

On appeal, we review the trial court's findings for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; accord, *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591.) Under that standard of review, we " ' "examine the entire

9

record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 298.) We presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.) We do not resolve credibility issues or evidentiary conflicts. (*Ibid*.) Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) Before we may set aside a trial court's order, it must be clear that " ' "upon no hypothesis whatever is there sufficient substantial evidence to support [it]." ' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

II.     Second degree implied malice murder

Morales raises two contentions about the trial court's finding he was guilty of second degree implied malice murder. First, the trial court applied an incorrect legal standard to find him guilty of that crime. Second, there was insufficient evidence to support second degree implied malice murder. We reject these contentions.

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) The primary difference between express malice and implied malice is the former requires an intent to kill but the latter does not. (*People v. Soto* (2018) 4 Cal.5th 968, 976.) Implied malice murder instead requires the killing be proximately caused by an act, " ' " 'the natural consequences of which are dangerous to life, which act was

10

deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*Reyes, supra*, 14 Cal.5th at p. 988.) Proximate causation requires the act to have been a substantial factor contributing to the death. (*Ibid.*) And conscious disregard for human life refers to a state of mind in which the person knows the conduct is dangerous to others but does not care if someone is hurt or killed. (*People v. Murphy* (2022) 80 Cal.App.5th 713, 726.)

The guilt of an aider and abettor to a crime, including murder, is "based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) "A person aids and abets the commission of a crime when [the person], (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

Accordingly, a direct aider and abettor of implied malice murder must, by words or conduct, aid the perpetrator's commission of a life-endangering act with the "knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life," and act "in conscious disregard for human life." (*People v. Powell* (2021) 63 Cal.App.5th 689, 713, italics omitted, cited with approval by *Reyes, supra*, 14 Cal.5th at p. 991 [implied malice murder requires proof of aider and abettor's "knowledge and intent with regard to the *direct perpetrator's* life endangering act"].) In other words, under

11

current law, "a direct aider and abettor of the killing who knew that his (or her) conduct endangered the life of another and acted with conscious disregard for life, may be guilty of second degree murder." (*People v. Langi* (2022) 73 Cal.App.5th 972, 979.)

In *Reyes*, our California Supreme Court clarified the type of act committed by an aider and abettor that is dangerous to human life for the purposes of implied malice murder. An act that merely creates a dangerous situation in which death is possible, depending on how circumstances unfolded, standing alone will not satisfy the proximate causation requirement of implied malice murder. (*Reyes*, *supra*, 14 Cal.5th at p. 989.) Rather, implied malice murder requires a high probability that death will result; the danger to life cannot be merely vague or speculative. (*Ibid.*; *People v. Cravens* (2012) 53 Cal.4th 500, 513 [probability of death cannot be remote or merely possible].)

In *Reyes*, *supra*, 14 Cal.5th at page 985, for example, the defendant Reyes was at a park with fellow gang members, one of whom openly displayed a gun. After someone in Reyes's group called out to a passing car, the group chased the car, and someone (not Reyes) shot at the car, killing its driver. (*Ibid.*) The court found that Reyes's act of traveling with an armed fellow gang member into rival gang territory could result in a gang confrontation during which it was *possible* someone could get hurt or killed, but the act did not by itself "give rise to a high degree of probability" death would result. (*Id.* at p. 989.) Further, there was no evidence Reyes's "acts precipitated or provoked the shooting." (*Ibid.*) And if the act of shooting was the dangerous act, there had to be evidence Reyes knew the shooter intended to shoot, intended to aid him in shooting, knew shooting

12

was dangerous to life, and acted in conscious disregard of life. (*Id.* at pp. 991–992.)

Here, Morales makes the interconnected claims that first, the trial court "failed to focus on" his "mental state as it related to the 'life-endangering act committed by the direct perpetrator,' " Martinez, and second, there was insufficient evidence Morales committed second degree implied malice murder.

First, nothing in the record suggests that the trial court misunderstood or misapplied the law. Rather, the trial court detailed the reasons for concluding, beyond a reasonable doubt, that Morales would be convicted of second degree implied malice murder under current law.[8] The trial court cited Morales's use of his own car, use of guns, motive, and planning activity as evidence of his mens rea. Otherwise, nothing the trial court said suggests it misunderstood that Morales had to know that Martinez intended to commit a life endangering act, intentionally aided and abetted that act with conscious disregard to human life, knowing the act was dangerous to human life.

Moreover, we do not agree with Morales's assertion that the trial court could not consider any part of Ojeda's testimony because the jury found he did not personally use a gun or inflict great bodily injury. This finding certainly suggests that the jury did not credit Ojeda's testimony that Morales told her he shot Valentino and Alvarado. While the trial court at the section 1172.6 evidentiary hearing had to accept those findings, it

---

[8] Implied malice remains a valid theory of second degree murder liability for an aider and abettor after Senate Bill 1437's enactment. (*Reyes, supra,* 14 Cal.5th at p. 991; *People v. Gentile, supra,* 10 Cal.5th at p. 850.)

13

nonetheless could still consider Ojeda's testimony. That is, a trier of fact may accept part of a witness's testimony and reject another part, weaving a cloth of truth from the evidence. (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67.) Thus, the trial court could consider Ojeda's testimony in determining whether beyond a reasonable doubt Morales aided and abetted second degree implied malice murder, even while respecting the verdict on the firearm enhancements.

Second, there was sufficient evidence that Morales directly aided and abetted the life-endangering acts of shooting Valentino and Alvarado with conscious disregard to human life. Morales had a motive for the shootings: Morales was upset that men had made advances to his girlfriend. Ojeda testified that Morales told her some men had made advances to his girlfriend, and that he and the others had searched for them. Ana Barraza corroborated Ojeda's testimony by herself testifying that she was dating Morales at the time of the shootings and that her child's father had threatened her. This motive is probative of Morales's conscious disregard to human life. (See generally *People v. Smith* (2005) 37 Cal.4th 733, 741 [motive for crime may be probative of intent to kill].)

Planning activity further showed that Morales intended to aid and abet the shootings. (See generally *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599 [conduct before and after offense relevant to determine whether defendant aided and abetted a crime]; *People v. Thomas* (2011) 52 Cal.4th 336, 355 [defendant's actions leading to crime may be relevant to mens rea and intent at time of crime].) Morales gathered fellow gang members in the early morning hours, and they drove around in his car, looking for the men who made the advances to Morales's girlfriend. That

14

the men were in Morales's car further supported an inference he was the plan's mastermind. Morales and his companions had three guns and ammunition with them. And the evidence showed that Morales knew about the guns and was himself armed with one: he told Ojeda he had a gun, and two guns were found in the Caltrans yard, where Morales fled after the shooting, further corroborating this part of Ojeda's testimony. Also, Martinez was wearing gloves when he was apprehended, and a latex glove and another set of gloves were found in the Caltrans yard. That all three men had guns and gloves further evidenced a plan to shoot the victims and to wear gloves to avoid identification.

Finally, evidence showed that Valentino and Alvarado were beaten, made to kneel, and shot in their heads at a downward trajectory. Alvarado was also shot in the back.[9] Shooting victims in the head area from within a few feet is a sufficiently particular and exacting method of killing to permit an inference the defendant was acting according to a preconceived design. (*People v. Halvorsen* (2007) 42 Cal.4th 379, 422; accord, *People v. Gomez* (2018) 6 Cal.5th 243, 283 [shooting victims at close range in head or neck shows premeditation and deliberation]; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 295 [close-range

---

[9] Ojeda testified that Morales told her he and Cervantes shot at Alvarado as he tried to escape. Other evidence corroborated this portion of her testimony: law enforcement found Alvarado a few feet from Valentino's body, and Alvarado had been shot in the back, as well as in the head.

15

shooting without provocation or evidence of struggle supports inference of premeditation and deliberation].)[10]

The evidence established that Morales knew the victims were going to be shot and that he aided that goal by arming himself, trying to disguise his identity, pursuing the victims with armed companions, and preventing their escape. The evidence further established that he knew the victims were going to be shot, because they were forced to kneel, inferentially at gunpoint, at which point the shooter's murderous intent was unmistakable. Thus, unlike the defendant in *Reyes*, there was evidence Morales knew the shooter intended to shoot, intentionally aided the shooting, knew that the shooting was dangerous to human life, and acted with conscious disregard to human life.

We therefore conclude that sufficient evidence supports the trial court's finding Morales guilty of second degree implied malice murder.

## II. Reduction to second degree murder

Morales's final contention is the trial court erred by refusing to reduce his first degree murder conviction to second degree murder. Several courts have recently rejected a similar contention, finding that the face of section 1172.6 does not permit reducing the degree of murder.

We review the interpretation of a statute de novo. (*People v. Gonzalez* (2023) 87 Cal.App.5th 869, 880.) We first examine the statute's words, giving them a plain and commonsense

---

[10] Neither Valentino nor Alvarado had injuries to their hands, suggesting they had no opportunity to defend themselves.

16

meaning.  (*Ibid.*)  If the plain language is clear and unambiguous, our inquiry ends and the plain meaning governs.  (*Ibid.*)

Section 1172.6, subdivision (d)(3), governs evidentiary hearings, which occur if the defendant has made a prima facie case for relief.  At an evidentiary hearing, the prosecution has the burden of proving beyond a reasonable doubt that the defendant "is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019."  (§ 1172.6, subd. (d)(3).)  If the prosecution meets its burden, then the defendant is not entitled to relief, and the court denies the petition for resentencing.  (*Ibid.*)  But if "the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be *vacated* and the petitioner shall be resentenced on the remaining charges."  (*Ibid.*, italics added.)  In that instance, the conviction "shall be redesignated as the target offense or underlying felony for resentencing purposes" if "murder or attempted murder was charged generically, and the target offense was not charged."  (*Id.* at subd. (e).)

At least two Courts of Appeal have found that, on its face, section 1172.6 "does not contain a mechanism for a trial court to reduce a first degree murder conviction to second degree murder." (*People v. Gonzalez* (2023) 87 Cal.App.5th 869, 880; accord, *People v. Didyavong* (2023) 90 Cal.App.5th 85, review granted June 28, 2023, S280047, review dism. October 18, 2023.)  Instead, section 1172.6 treats all murder as a single, generic crime and requires resentencing only when a defendant could not now be convicted of murder generically, without reference to the degree of murder. (*Didyavong*, at p. 96.)  Section 1172.6 thus permits only two options in adjudicating a resentencing petition:  (1) deny the

17

petition, leaving in place the murder conviction, or (2) grant the petition, vacating the murder conviction and resentencing the defendant on the remaining charges, target offense, or underlying felony. (*Gonzalez*, at p. 881.)

Given section 1172.6's use of the word "vacate," we agree that the statute permits a murder conviction only to be set aside and does not permit reduction of the degree of murder.

Nonetheless, we are cognizant of the seemingly incongruous position this leaves Morales in: a trial court has found he is guilty of only second degree murder, yet, he stands convicted of and sentenced on first degree murder, with no remedy apparent, at least under section 1172.6. However, the Legislature may properly enact reform one step at a time, limiting the ameliorative effects of legislation to the class or classes of person it thinks need it most. (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 488.) While section 1172.6 aims to ensure a person's sentence is commensurate with the person's individual criminal culpability, the Legislature chose to achieve that aim by giving specified relief to a class of people who could not be convicted of murder generically because of revisions to laws regarding felony murder and the natural and probable consequences doctrine. (See *People v. Coley* (2022) 77 Cal.App.5th 539, 549 [§ 1172.6 "is not a means by which a defendant can relitigate issues already decided"]; *People v. Farfan* (2021) 71 Cal.App.5th 942, 947 ["mere filing" of § 1172.6 petition does not afford petitioner new opportunity to raise trial error claims or attack sufficiency of evidence to support jury's findings]; *People v. DeHuff* (2021) 63 Cal.App.5th 428, 438 [§ 1172.6 is not a direct appeal].) We are not free to substitute our judgment for the Legislature's about what might be a better

policy.  (*City and County of San Francisco v. Sweet* (1995) 12 Cal.4th 105, 121.)

## DISPOSITION

The order denying Cesar Morales's Penal Code section 1172.6 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

ADAMS, J.