Filed 3/7/13  P. v. Landry CA6
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037131 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1079877, CC772555, CC822226, CC894661) |
| v. | |
| DESHAWN LANDRY et al., | |
| Defendants and Appellants. | |

Codefendants Lamar Landry, Deshawn Landry[1] and Eric Greer were convicted by a jury of one count of assault by means of force likely to produce great bodily injury. (Pen. Code, § 245, subd. (a)(1).)[2]  The jury also found true an allegation that Lamar, Deshawn and Greer personally inflicted great bodily injury on the victim, Anthony Mata, in the course of the assault.  (§§ 12022.7, subd. (a), 1203, subd. (e)(3).)  The three codefendants were among a group of people who assaulted Mata outside a San Jose nightclub early in the morning of June 16, 2010.  Mata was knocked to the ground during the fight and kicked at least twice in the head, suffering severe injuries.  The melee was witnessed by several people including two bouncers from nearby nightclubs and the manager of one of those same clubs.

---

[1] To minimize confusion, we will henceforth refer to Lamar and Deshawn by their first names.

[2] Further unspecified statutory references are to the Penal Code.

Lamar was sentenced to a total term of 14 years in prison; Deshawn was sentenced to a total term of 11 years in prison; and Greer was sentenced to a total term of five years in prison.

On appeal, Lamar argues that the court erred in admitting a statement made by Greer during a jailhouse telephone call to a third party in which Greer apparently admitted his involvement, along with unspecified others, in the assault. Lamar contends that this statement, while nontestimonial and properly admitted against Greer as a declaration against interest, should not have been admitted as evidence of Lamar's guilt. We disagree and shall affirm the judgment against Lamar.

Deshawn argues there was insufficient evidence to support the jury's finding that he personally inflicted great bodily injury on Mata and also that the jury was improperly instructed on that enhancement allegation. He also argues that the prosecutor violated his due process rights and right to a fair trial by requesting aiding and abetting instructions following the close of evidence, when before trial she indicated Deshawn would be tried solely as a direct perpetrator of the assault. We agree there was insufficient evidence to support the finding that Deshawn personally inflicted great bodily injury on Mata and shall reverse the judgment as to Deshawn.[3] We disagree that there was any due process violation or that Deshawn was deprived of the right to a fair trial by the prosecutor's request for aider and abettor instructions.

As to Greer, we appointed counsel to represent him in this court. Appointed counsel filed an opening brief which states the case and the facts, but raises no specific issues. We notified Greer of his right to submit written argument in his own behalf within 30 days. That period has elapsed, and we have received no written argument from Greer. Pursuant to *People v. Wende* (1979) 25 Cal.3d 436 and *People v. Kelly* (2006) 40

---

[3] We therefore need not reach Deshawn's argument that the jury was improperly instructed on the great bodily injury enhancement.

Cal.4th 106, we have reviewed the whole record and have concluded there is no arguable issue on appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Information

Deshawn, Lamar and Greer, along with three additional codefendants, John Louis Downs 3 (*sic*), Brian Keith Sabathia and Christopher Anthony Leggett,[4] were charged by information dated October 28, 2010, with one count of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)) and it was further alleged that each defendant personally inflicted great bodily injury on Mata in the commission of that assault (§§ 12022.7, subd. (a), 1203, subd. (e)(3)). Deshawn and Downs were separately charged with a misdemeanor count of resisting, delaying or obstructing an officer (§ 148, subd. (a)(1)). The information further alleged that Greer, at the time of the charged assault, was out of custody on bail for felony assault with a deadly weapon (§ 245, subd. (a)(1)) within the meaning of section 12022.1. Deshawn was alleged to have a prior juvenile adjudication for shooting at an occupied motor vehicle (§ 246), which counted as a strike prior (§§ 667, subds. (b)-(i), 1170.12). Lamar was alleged to have a prior serious felony conviction and a prior strike conviction. (§§ 667, subds. (a), (b)-(i), 1170.12.)

### B. Evidence presented at trial

#### 1. Eyewitness and police testimony

At approximately 1:30 a.m. on June 16, 2010, Dustin Isaacson was standing outside the VooDoo Lounge, a nightclub where he worked as a security guard. The nightclub was closing, and Isaacson was helping to clear the bar and reduce congestion on the sidewalks, as other clubs in the area close at the same time.

---

[4] Downs, Sabathia and Leggett entered into plea bargains before trial and are not involved in the instant appeal.

Isaacson heard a loud group of between 15 and 20 people crossing the street from the direction of Toons, another nightclub near the VooDoo Lounge. As Isaacson watched, this group stopped directly across from the VooDoo Lounge and some of those near the front of the group turned towards the ones in the back and there was shouting back and forth. Isaacson thought the groups would split up without further incident, but as some of the people continued to argue, those near the edges returned and a physical fight began. Isaacson called 911.

He continued to observe the fight, and saw a man, later identified as Mata, get thrown to the ground and kicked at least twice in the head. Isaacson recognized a security guard from Toons, whose name he did not know, trying to separate the combatants and trying to pull people off of Mata.

Isaacson flagged down a passing police car, and a second officer arrived just as the fight was breaking up. By the time the police arrived, the other security guard had returned to Toons.

Isaacson, a trained EMT, went to assist Mata. Mata was lying face up, his eyes swollen shut and he was bleeding from the mouth and nose. He had a three-inch long laceration on his forehead, small cuts above his eyebrows and smaller cuts on the side of his face. Mata was conscious and moaning, but could not respond to questions.

Armando Martinez, the manager of Toons, was aware that two Hispanic men had been escorted out of the nightclub shortly before closing. He saw them outside and tried to calm one of them down, then walked them to a nearby parking lot. Martinez saw the two men again a short time later, between Toons and the VooDoo Lounge. The one who had been most upset before was yelling at and taunting passersby, while his companion remained quiet. As Martinez walked towards the two men, several men in the crowd attacked the quieter man and perhaps 10 people went after the louder man. The louder man (Mata) went down and stopped moving, as blood pooled underneath him. Martinez

4

was unable to identify anyone in the crowd of people who attacked Mata and his companion.

Mata went out with his friend, Joey, on the evening of June 15, 2010.  Because Joey was not dressed properly for one bar, they went to Toons, which has a more relaxed dress code.  After consuming six or seven mixed drinks, Mata was carried out of Toons by a bouncer.  The next thing he remembers is waking up from a coma in a hospital bed.  Mata had bruises on his head, arms, and chest, as well as lacerations on his arms, and stitches above his left eyebrow and on his nose, which left scars.  He had a broken nose and a broken bone underneath his eye.  At the time of the trial, Mata continued to suffer from short term memory loss and migraines.

After Mata returned to work, a light skinned Black or Latina woman stopped by and talked to him, saying she was the girlfriend of one of the men who attacked him.  She "apologized on behalf of the gentleman," gave Mata her phone number and said he should call her if there was anything she could do to help with his medical bills or anything.  Though she seemed sincere and he was never threatened by anyone, Mata was slightly afraid because if that woman could find him, so could other people.

San Jose Police Lieutenant David Santos was patrolling in downtown San Jose that evening and happened to be stopped for a red light at the intersection of Second Street and Santa Clara Street, near Toons and the VooDoo Lounge at the time of the incident.  Four people ran up to his patrol SUV, and he heard a woman yell, "They're killing him."  Santos looked over and saw people running away, with one man lying on the ground, a pool of blood around his head.

A person standing near Santos said, "They're leaving in the black car."  Santos saw a black Charger pull out of a parking lot, driving rapidly south on Second Street.  Santos pursued the vehicle, which made a right turn onto San Fernando Street.  Santos activated his lights and siren and the Charger stopped at the intersection of San Fernando and First Streets.

5

Santos got out of his SUV, with his weapon drawn, and five people climbed out of the Charger. The men were each looking in different directions and Santos noted that none of them seemed to be paying any attention to him, which he thought odd. He twice ordered the five men to get on the ground, but they did not move. As Santos heard more sirens approaching, the five men ran off in different directions. He broadcast that the men had run off, but Santos remained by the Charger as he saw there were more people inside. Santos ordered them to come out of the car one at a time. A total of four more people exited the vehicle: Greer, Lamar, Sabathia and Leggett.

Officers Phillip Giusto and Jarrod Jesser responded to Santos's reports about stopping the Charger and that some of the suspects had fled northbound on First Street. Santos described the suspects as Black males, including one wearing a white t-shirt and one wearing a red baseball cap. Giusto and Jesser spotted a Black male wearing a white t-shirt, hiding behind a pillar on Post Street at the end of Lightston Street. Jesser contacted the man, later identified as Deshawn, and took him into custody. As Deshawn was sitting on the curb, Jesser noticed spots of blood on Deshawn's white athletic shoes. Jesser took Deshawn's shoes and placed them in evidence collection bags.

Giusto also saw a second suspect, John Downs, wearing a red baseball cap, and ordered him to lie on the ground. Santos identified Deshawn and Downs as two of the five men who had run away from the Charger.

Adrian Gastelo was a security guard at Toons that evening, and tried to break up a fight involving 25 to 30 people outside the nightclub. As the fight was underway, he saw five or six people jump out of a Camry and join in. He overheard one of the people from the Camry, say "there it goes," or "there they go," as he got out of the car. As Gastelo pulled people out of the melee, he could see Mata on the ground, unconscious and bleeding from his head and neck. He tried to protect Mata from further injury, and as the fight broke up, Gastelo heard sirens which caused the remaining people to scatter. As he

6

did not want to get involved, Gastelo first went back into Toons and then went home. He returned to the nightclub after police called and asked him to come back.

At trial, Gastelo testified that he did not, in fact, see the fight start, but only saw the end of it. He did not see Deshawn, Lamar or Greer hit, punch or kick Mata while he was on the ground, and he lied to the police when he identified them as being involved in the fight. Gastelo said that he lied because, when he initially returned to Toons at a police officer's request, another unidentified plainclothes Black police officer called him by his full name, said Gastelo had outstanding warrants and urged him to cooperate fully. A uniformed police officer then came up and asked him what he had seen. Gastelo was afraid he would be arrested if he did not tell the police officer what he wanted to hear, so he described what he had overheard other people in Toons saying about the fight. Based on what he had heard, he told police he saw a tall Black man wearing a purple hat and a purple shirt hit Mata in the back of the head. After Mata fell to the ground, a group of 11 or so Black males kicked and punched him. However, Gastelo denied that he personally witnessed any of that.

In September 2010,[5] police went to Gastelo's house to serve him with a subpoena to testify at the preliminary hearing, but he was not home. In a subsequent phone call, Gastelo told a police officer he would be at work on the afternoon of September 29, but he was not there when police arrived with the subpoena. Gastelo was finally served with the subpoena the following day. In spite of the subpoena, Gastelo failed to appear at the preliminary hearing.

When asked about his failure to appear for the preliminary hearing, Gastelo testified that he ignored it because he "hate[s] court." Instead he went to work, where he was arrested. After spending two days in jail, he was released and subsequently testified at the preliminary hearing, where he said he did not see the fight first-hand and thus did

---

[5] The reporter's transcript erroneously lists the date as "9/27/2011."

7

not recognize any of the defendants. According to Gastelo, the only reason he falsely accused the defendants in the first place was in order to avoid being arrested on the unspecified warrants referenced by the unidentified plainclothes officer who spoke to him the night of the assault.

Police Officer Anson Kahaku contradicted Gastelo's trial testimony. Kahaku testified he was the officer who called Gastelo that morning and asked that he return downtown to relate what he had seen. Kahaku said he never checked to see if Gastelo had any outstanding warrants. When Gastelo returned to the nightclub that evening, he was very cooperative.

According to Kahaku, Gastelo said he saw a tall Black man wearing a purple hat and shirt hit Mata on the head from behind, knocking him to the ground. Approximately 11 Black males then kicked and punched Mata as he lay on the ground.

Kahaku took Gastelo to the corner of San Fernando and First Street, where he identified Greer, Lamar, Sabathia and Leggett as part of the group that beat and kicked Mata. Gastelo said Lamar was one of the people that exited the Camry to join the fight and also said that he was the tall man in the purple shirt and hat that hit Mata in the back of the head. Gastelo also specifically said that he witnessed Greer and Lamar kick Mata as he lay on the ground.

Kahaku then took Gastelo to another location, where Downs and Deshawn were being held, for a second in-field identification. At the second location, Gastelo said Downs had kicked Mata as he was on the ground. Gastelo said Deshawn was one of the people who had jumped out of the Camry and joined the fight. However, he did not indicate that he saw Deshawn actually hit or kick Mata at any time during the fight. Gastelo heard Deshawn say as he and the others got out of the Camry that they should handle it "one on one."

There was no record in the San Jose Police Department computer system that any officer ran a warrants check for Gastelo during the relevant time period. Also, according

8

to police records, there were four nonuniformed police officers on duty that morning, none of whom were Black. The only uniformed Black officer on duty that evening was Officer Vernon Todd, who assisted Santos after he stopped the Charger. Todd testified he did not speak with Gastelo or any other witnesses outside Toons that evening. Although police dispatch records showed Todd arriving at the scene outside the VooDoo Lounge at approximately 1:35 a.m., Todd said this was likely due to him not advising the dispatcher that he diverted to Santos's location instead of responding to Toons.

### 2. *Forensic evidence*

As with Deshawn's shoes, Lamar's shoes also appeared to have blood on them and were taken into evidence, along with a purple shirt located in the back seat of the Charger. DNA testing disclosed that Mata was the sole source of the blood on Lamar's and Deshawn's shoes. Mata's DNA was found in blood stains on Greer's shoes. Lamar, Deshawn and Greer also had blood on their clothing.

Criminalist Cordelia Willis studied the blood spatter on Deshawn and Lamar's shoes. According to Willis, the spatter on Deshawn's right shoe consisted of small droplets of blood, which traveled at medium velocity through the air for anywhere from one to four feet before hitting the shoe. The patterns were characteristic of stomping, kicking or other uses of force, and Deshawn's right shoe was approximately one foot away from the blood source at the time it was spattered. However, Willis could not say whether or not Deshawn's shoe came into direct contact with a source of blood; rather, the most she could say was that the blood droplets traveled through the air a short distance before striking his shoe.

### 3. *Jailhouse telephone calls*

The jury heard edited versions of audio tapes of phone calls made from jail by Deshawn and Greer, as well as a recording of a jail visit between Deshawn and a third party. The calls made by Deshawn were admissible only against him, and concerned efforts to persuade various witnesses to testify either that he was not present at the scene

9

or that he was only trying to help Mata. In the phone calls, Deshawn denied being present at the scene, but during the jail visit, he said the witnesses from Toons could testify they saw him "helping the dude up and helping the dude, . . . who, who all got jumped."

A call made by Greer on July 20, 2010, was played at trial and was admitted as a declaration against penal interest and the jurors were instructed that they could also consider it as evidence against all of the codefendants. The portion of that call which was played for the jury consisted of the following exchange: "[Greer]: You know, man. You know, how, you know how San Jose, Santa Clara, man, Santa Clara is one of those counties that even if you don't do nothing they gonna try to get you for doing something. So you know . . . . [Third party]: Yeah. [Greer]: We, we did something and we're trying to prove that we didn't do nothing. You know, it's just gonna look a whole lot uglier. [Third party]: Yeah, I know what you mean."

### 4. Defense evidence

Corey Maciel, a paramedic who responded to the scene of the fight and assisted Mata, testified that Mata appeared confused and exhibited an altered level of consciousness, giving inappropriate responses to questions. Maciel did not think this was unusual given the injuries Mata had sustained that night.

Investigator Anne Fields, hired by Deshawn's counsel, testified she visited the crime scene in December 2010 and took measurements.

Torian Carrillo, an investigator employed by Fields, testified that she spoke to Armando Martinez during her investigation of this case, but did not threaten him in any way.

Bruce Wiley, an investigator for the Santa Clara County District Attorney's office, testified he interviewed Gastelo, following the preliminary hearing, to discuss why his testimony at that hearing differed from the statements he gave to the police the night of the assault.

10

## C.     Verdict and sentencing

The jury found Deshawn, Lamar and Greer guilty of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)) and also found that each of them personally inflicted great bodily injury on Mata in the course of that assault (§§ 12022.7, subd. (a), 1203, subd. (e)(3)).  The jury also found Deshawn guilty of misdemeanor resisting, delaying or obstructing an officer (§ 148, subd. (a)(1)).

The court subsequently found true[6] that Deshawn had a prior juvenile adjudication for shooting at an occupied vehicle (§ 246), which counts as a strike prior (§§ 667, subds. (b)-(i), 1170.12).  As to Lamar, the court found true the allegations that he had a prior serious felony conviction and a prior strike conviction (§§ 667, subds. (a), (b)-(i), 1170.12).  With respect to Greer, the court found true the allegation, pursuant to section 12022.1, that at the time he committed the instant assault against Mata, he was out of custody on bail on a felony charge of assault with a deadly weapon (§ 245, subd. (a)(1)).

At sentencing, the court denied Lamar's *Romero*[7] motion and sentenced him to a total term of 14 years, consisting of the middle term of three years on the assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)), doubled to six years pursuant to the strike prior, plus three years for the great bodily injury enhancement (§ 12022.7, subd. (a)), plus an additional five years for his prior serious felony conviction (§ 667, subd. (a)).  The court also imposed a concurrent middle term of three years for an admitted violation of probation in a separate case.  Lamar was awarded a total of 420 days of credit, consisting of 366 days of custody credits and 54 days of conduct credits.[8]

---

[6] Just prior to the jury rendering its verdict, the codefendants waived their right to a jury trial on the remaining sentencing enhancement allegations.

[7] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

[8] In the probation violation case, Lamar was awarded 647 days of credit--563 custody plus 84 conduct.

As to Deshawn, after denying his motion to strike his prior juvenile adjudication for sentencing purposes, the court sentenced him to a total term of 11 years, consisting of the middle term of three years on the assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)), doubled to six years due to the strike prior, plus three years for the great bodily injury enhancement (§ 12022.7, subd. (a)). The court also imposed two consecutive one year (one-third the middle term) terms for two admitted violations of probation in separate cases. Deshawn was awarded 420 days of credit, consisting of 366 custody credits and 54 conduct credits in the controlling case.[9]

Greer was sentenced to a total term of five years, consisting of the lower term of two years on the assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)), plus three years for the great bodily injury enhancement (§ 12022.7, subd. (a)). Pursuant to a prior plea bargain, Greer was sentenced to a consecutive term of eight months for the case which served as the basis for the "on bail" enhancement allegation (§ 12022.1). The court applied a portion of his custody credits to satisfy that term, following which the court struck the "on bail" enhancement. He was then awarded total credits of 187 days, consisting of 163 custody credits and 24 conduct credits. The court imposed a $30 court security fee, a $30 criminal conviction assessment and a $1,000 restitution fine. Greer waived his right to attend a restitution hearing.

At the July 19, 2011 restitution hearing, the court ordered each codefendant, including Downs, Leggett and Sabathia, to pay $30,862, plus interest, in victim restitution directly to Santa Clara Valley Medical Center. The codefendants were ordered to pay restitution jointly and severally.

---

[9] Deshawn was also awarded credits against his sentences in the two probation violation cases. He received 280 days of credit (244 custody and 36 conduct) in one case and 127 days of credit (111 custody and 16 conduct) in the second case.

## II. DISCUSSION

### A. *Insufficient evidence Deshawn personally inflicted great bodily injury on Mata*

Deshawn argues that there was insufficient evidence to support the jury's finding that he personally inflicted great bodily injury on Mata since there was no evidence he committed any acts which could have resulted in great bodily injury. Though Gastelo told police he saw Deshawn at the scene of the fight, there was no testimony from anyone that Deshawn punched or kicked Mata. In fact, Gastelo also told police that Deshawn, when exiting the Camry at the start of the fight, told his companions that the fight should be "one on one." We agree that the evidence presented at trial was not sufficient to establish that Deshawn personally inflicted great bodily injury on Mata.

In considering a claim of insufficient evidence, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence--that is, evidence which is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

Section 12022.7, subdivision (a) authorizes additional punishment for "[a]ny person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony . . . ."

In *People v. Cole* (1982) 31 Cal.3d 568, 572, the Supreme Court held that the phrase "personally inflicts" in section 12022.7 means what it says: "[T]he individual accused of inflicting great bodily injury must be the person who *directly* acted to cause the injury." (Italics added.) In *People v. Modiri* (2006) 39 Cal.4th 481 (*Modiri*), the Supreme Court explained how to apply section 12022.7 when the injury is inflicted in the course of a group beating. *Modiri* held that the defendant need not act alone to have personally caused a victim's injuries. (*Modiri*, *supra*, at p. 493.) A person may receive an enhanced sentence under section 12022.7 if the person "joins others in *actually*

13

*beating and harming* the victim, and where the precise manner in which he contributes to the victim's injuries cannot be measured or ascertained." (*Modiri*, *supra*, at p. 495, italics added.) The personal-infliction finding can be made "if defendant personally applied force to the victim, and such force was sufficient to produce grievous bodily harm either alone or in concert with others." (*Id*. at p. 497.)

Here, the evidence showed that Deshawn was present at the scene of the fight. Gastelo identified him as being one of the people that exited the Camry and ran over to the group fight. Mata's blood was on his shoes. However, Gastelo did not tell anyone that he saw Deshawn throw any punches at Mata or kick him. Criminalist Willis testified that, though the blood spatter on Deshawn's right shoe was formed when small droplets of blood traveled at medium velocity through the air for approximately one foot before striking his shoe and that this pattern was characteristic of stomping, kicking or other use of force, she could not say whether or not his shoe came into *direct* contact with the blood source (i.e., Mata). All she could say was that the blood droplets traveled through the air a short distance before striking Deshawn's shoe.

Considering this evidence in the light most favorable to the judgment, we cannot find that it presents substantial evidence that Deshawn personally inflicted great bodily injury on Mata. No one saw him hit or kick Mata and the blood spatter only established that Deshawn's shoe was approximately one foot away from the source of the blood, not that it ever came into direct contact with Mata's body. Based on this evidence we cannot say a reasonable finder of fact could conclude beyond a reasonable doubt that the blood got on Deshawn's shoe because he kicked him and thus personally applied force sufficient to cause great bodily harm.

B.    *No error in allowing aiding and abetting instructions*

1.    *Background*

During voir dire, defense counsel asked the prosecution to set forth its theory of guilt in the case and the prosecution indicated that it considered each codefendant to be a

14

direct perpetrator of the assault. Following the close of evidence, the prosecutor requested that the jury be instructed on aiding and abetting. Deshawn's counsel objected that submitting those instructions to the jury would violate his due process rights and right to a fair trial. The court overruled the objection, citing *People v. Jenkins* (2000) 22 Cal.4th 900 (*Jenkins*) and instructed the jury on the aider and abettor theory of liability.

### 2. *Analysis*

Under the Sixth Amendment to the United States Constitution, an accused has the right "to be informed of the nature and cause of the accusation" against him. In general, the prosecution need not provide specific notice of which theories of guilt it will pursue at trial; rather, the accused "will receive adequate notice of the prosecution's theory of the case from the testimony presented at the preliminary hearing" as well as from the information. (*People v. Diaz* (1992) 3 Cal.4th 495, 557.) In *People v. Bishop* (1996) 44 Cal.App.4th 220, 231, the court stated that "[t]o effectuate the constitutional rights to counsel and to due process of law, an accused must be informed of the crimes with which he is charged in order to have a reasonable opportunity to prepare a defense and respond to the charges."

We think the trial court properly relied on *Jenkins* in overruling the objection to aider and abettor instructions. In *Jenkins*, a capital murder case, Jenkins was charged with, among other things, first degree murder and conspiracy to murder. (*Jenkins*, *supra*, 22 Cal.4th at p. 930.) On appeal, Jenkins claimed "the court erred in instructing the jury that defendant could be found guilty of murder either as a direct perpetrator or as an aider and abettor, because the prosecutor had contended throughout the proceedings that defendant was the person who shot [the victim]." (*Id*. at pp. 1023-1024.) After noting that "[n]ormally, 'the accused will receive adequate notice of the prosecution's theory of the case from the testimony presented at the preliminary hearing,' " the California Supreme Court found that the aider and abettor instruction did not violate Jenkins's due

15

process rights as he "was put on actual notice through the conspiracy charge that he could be subject to accomplice liability for the murder." (*Id.* at p. 1024.)

Deshawn's reliance on *Sheppard v. Rees* (9th Cir. 1989) 909 F.2d 1234, is misplaced. In that case, the state conceded on appeal that the prosecution's last-minute request for felony-murder instructions, after both sides had rested, misled Sheppard and denied him an effective opportunity to prepare a defense. (*Id*. at pp. 1236-1237.) The court concluded the error could not be considered harmless because it denied Sheppard the opportunity to present evidence to defend against the new theory. The court stated: "Here, the prosecutor 'ambushed' the defense with a new theory of culpability after the evidence was already in, after both sides had rested, and after the jury instructions were settled. This new theory then appeared in the form of unexpected jury instructions permitting the jury to convict on a theory that was neither subject to adversarial testing, nor defined in advance of the proceeding." (*Id*. at p. 1237.)

Here, Deshawn cannot make a credible claim to having been denied an effective opportunity to prepare a defense. Although there was no conspiracy charged in this case, the testimony at the preliminary hearing, as well as the fact that Deshawn was one of six codefendants charged with assault by means of force likely to produce great bodily injury, was sufficient to put him on notice that he could be tried as a direct participant or as an aider and abettor. The testimony from the preliminary hearing was almost identical to that presented at trial, namely that Deshawn: (1) was seen jumping out of a Camry with several other young men, including Lamar, to join the melee, (2) was overheard saying to the members of this group that the fight should be "one on one," (3) was involved in the fight, though no one saw him actually hit or kick Mata, (4) fled from the police after the black Charger was stopped near the scene of the fight, and, following his apprehension, (5) had the victim's blood on his shoes.

As noted in *People v. Lucas* (1997) 55 Cal.App.4th 721, 737, "direct perpetrators and accomplices have long been treated by statute as principals equally liable under the

16

law (§§ 31-32) and since a statute specifies that allegations of principal status suffice to proceed on accomplice theories (§ 971), case law has long held due process notice satisfied as to defendants prosecuted as aiders and abettors [citation], accessories after the fact [citation] or conspirators." Accordingly, given the evidence presented at the preliminary hearing, Deshawn had sufficient notice that he could be found liable as either a direct participant or as an aider and abettor of the assault on Mata and we conclude the instructions on aider and abettor liability, first requested following the close of evidence, did not deprive Deshawn of due process.

### C.  Admission of Greer's phone conversation against Lamar

Lamar contends the trial court erred in instructing the jury that Greer's jailhouse telephone conversation could be considered as evidence of Lamar's guilt. The court found the statement was nontestimonial and, though hearsay, admissible as a declaration against penal interest. Lamar concedes that the statement was nontestimonial and limits his challenge to its admission under the declaration against interest exception. We agree that the statement was nontestimonial, but disagree that the trial court erred in permitting it to be used against Lamar.

A criminal defendant has the right under both the federal and state Constitutions to confront the witnesses against him. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the United States Supreme Court held that, under the confrontation clause, "[t]estimonial statements of witnesses absent from trial" are admissible "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine [the witness]." (*Id.* at p. 59.) However, "[u]nder *Crawford*, . . . the Confrontation Clause has no application to [out-of-court, nontestimonial statements not subject to prior cross-examination] and therefore permits their admission even if they lack indicia of reliability." (*Whorton v. Bockting* (2007) 549 U.S. 406, 420; see also *Davis v. Washington* (2006) 547 U.S. 813, 821.) "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers'

17

design to afford the States flexibility in their development of hearsay law . . . ." (*Crawford*, *supra*, at p. 68.)

The veracity of nontestimonial hearsay statements is sufficiently dependable to allow the untested admission of such statements against a defendant when (1) the evidence falls within a firmly rooted hearsay exception or (2) the evidence contains "particularized guarantees of trustworthiness" such that adversarial testing would be expected to add little, if anything, to the statements' reliability. (*Ohio v. Roberts* (1980) 448 U.S. 56, 66; *Crawford*, *supra*, 541 U.S. at p. 68.) In *Lilly v. Virginia* (1999) 527 U.S. 116 (*Lilly*), a plurality of the court held that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." (*Id*. at p. 134.) "This, of course, does not mean, . . . that the Confrontation Clause imposes a 'blanket ban on the government's use of [nontestifying] accomplice statements that incriminate a defendant.' Rather it simply means that the government must satisfy the second prong of the *Ohio v. Roberts*, 448 U.S. 56 (1980), test[, that the statements bear a particularized guarantee of trustworthiness,] in order to introduce such statements." (*Id* at p. 134, fn. 5.) On appeal, we conduct a de novo review to determine whether that trustworthiness test has been satisfied. (*Id*. at pp. 136-137.)

"In California, '[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true.' ([Evid. Code,] § 1230.) The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.) " 'To determine whether [a particular]

declaration [against penal interest] passes [Evidence Code] [section 1230's] required threshold of trustworthiness, a trial court "may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant." ' [Citation.] We have recognized that, in this context, assessing trustworthiness ' "requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception." ' " (*Id*. at p. 614.)

"There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against [penal] interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334 (*Greenberger*).) "When examining what was actually said by the declarant special attention must be paid to any statements that tend to inculpate the nondeclarant. This is so because a statement's content is most reliable in that portion which inculpates the declarant. It is least reliable in that portion which shifts responsibility. Controversy necessarily arises when the declarant makes statements which are self-inculpatory as well as inculpatory of another. This is why Evidence Code section 1230 only permits an exception to the hearsay rule for statements that are specially disserving of the declarant's penal interest. [Citation.] This is not to say that a statement that incriminates the declarant and also inculpates the nondeclarant cannot be specifically disserving of the declarant's penal interest. Such a determination necessarily depends upon a careful analysis of what was said and the totality of the circumstances." (*Id*. at p. 335.)

The Court of Appeal in *Greenberger* considered out-of-court statements made by some defendants implicating other defendants. The court held that "a defendant's

19

declarations against [penal] interest may be received in a joint trial without denying the codefendant the right of confrontation guaranteed by the United States Constitution." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 314.) "Since declarations against [penal] interest may be admitted in evidence without doing violence to the confrontation clause, we see no reason why such declarations, when made by a codefendant, should not also be admissible." (*Id*. at p. 332.)

In *People v. Cervantes* (2004) 118 Cal.App.4th 162 (*Cervantes*), a nontestifying codefendant, Morales, inculpated himself and his two codefendants, Cervantes and Martinez, in a murder and an attempted murder while speaking to a friend of all three defendants, Ojeda. (*Id*. at pp. 166-167.) On appeal the two codefendants contended that Morales' statement to the friend should have been excluded. (*Id*. at p. 169.) The appellate court found that the trial court did not err in admitting evidence of the statement at the defendants' joint trial. Following *Greenberger*, the court found that the statement qualified as a declaration against penal interest and satisfied the constitutional standard of trustworthiness. (*Id*. at p. 177.) "The evidence here showed Morales made the statement within 24 hours of the shooting to a lifelong friend from whom he sought medical treatment for injuries sustained in the commission of the offenses. . . . Regarding the content of the statement, Morales did not attribute blame to Cervantes and Martinez but accepted for himself an active role in the crimes and described how he had directed the activities of Martinez." (*Id*. at p. 175.) "Ojeda consistently reported that Morales admitted shooting at the second male with Cervantes. The statement Cervantes shot the first male, as well as the statement Morales shot at the second male, both incriminated Morales because Morales was acting in concert with Cervantes at all relevant times. Thus, the discrepancies in the statement as repeated by Ojeda does not preclude a finding the statement was trustworthy." (*Id*. at p. 176.) "Regarding the claim the statement should have been redacted to exclude reference to the nondeclarants, *Greenberger* specifically held this is not required where the statement admitted into evidence is

20

disserving to the interests of the declarant. We agree with *Greenberger*'s analysis on this point." (*Ibid.*)

Here, the statement by Greer implicated himself, as well as his codefendants, in the beating. The statement was not made to the police during questioning and in the statement Greer made no effort to mitigate his own conduct or shift the blame. The statement itself was, overall, extremely vague and offered no details about the event. Greer did not name anyone, nor did he set forth what role any particular person played in the attack. All he said was "We, we did something and we're trying to prove that we didn't do nothing. You know, it's just gonna look a whole lot uglier." "[T]he most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures." (*Greenberger*, *supra*, 58 Cal.App.4th at p. 335; *Cervantes*, *supra*, 118 Cal.App.4th at p. 175.)

After independently reviewing the record, we find that the statements Greer made in the jailhouse telephone call to Leggett bore a particularized guarantee of trustworthiness. Accordingly, admission of those statements against Lamar did not violate the federal or state Constitutions or state law. (*Lilly*, *supra*, 527 U.S. at pp. 136-137; *Ohio v. Roberts*, *supra*, 448 U.S. at p. 66; *Cervantes*, *supra*, 118 Cal.App.4th at p. 177.)

## III.    DISPOSITION

With respect to Lamar Landry and Eric Greer, the judgments are affirmed.

As to Deshawn Landry, the judgment is reversed. The trial court is directed to reinstate the judgment with the following modification: the allegation that Deshawn Landry personally inflicted great bodily injury on Anthony Mata (Pen. Code, §§ 12022.7, subd. (a), 1203, subd. (e)(3)) is not true. Following reinstatement of the modified judgment, Deshawn Landry is to be arraigned for resentencing.

21

_____
Premo, J.

WE CONCUR:


_____
Rushing, P.J.


_____
Elia, J.