Filed 9/9/14  P. v. Banister CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>STEVEN ARTHUR BANISTER and<br>TRAVIS MARTIN CODY,<br><br>　　Defendants and Appellants. | G049837<br><br>(Super. Ct. No. INF10000236)<br><br>O P I N I O N |

　　　　　　Appeals from judgments of the Superior Court of Riverside County, Richard A. Erwood, Judge.  Affirmed.

　　　　　　Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant Steven Arthur Banister.

　　　　　　Eric S. Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant Travis Martin Cody.

　　　　　　Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

　　　　　　　　　　*　　　　　　*　　　　　　*

A jury found defendants Steven Arthur Banister and Travis Martin Cody guilty of the murder of Edward Keeley (Pen. Code, § 187, subd. (a); all undesignated statutory references are to the Penal Code), and found true the robbery and burglary special circumstance allegations (§ 190.2, subds. (a)(17)(G) [burglary], (a)(17)(A) [robbery]). The jury also found Banister served five separate terms in state prison (§ 667.5, subd. (b)) and Cody served two prior terms in state prison. The court sentenced Banister to life without the possibility of parole (LWOP) and a consecutive term of five years (one year for each of Banister's prior prison terms), and sentenced Cody to LWOP and a consecutive two-year term (one year for each of Cody's prior prison terms).

I

FACTS

A. *Keeley's Death*

Edward Keeley's daughter introduced her 75-year-old father to Linda Herzel. On August 9, 2009, Herzel and Keeley went to a matinee movie. After the movie, Keeley drove Herzel to his house in Desert Hot Springs in his new, blue Hyundai. He said he wanted to show her the "little Western Town" he was building on a couple of acres. After he showed her around the project, they went out to dinner. It was still light out when they left the Mexican restaurant. Keeley drove Herzel home and it was dark by the time they went their separate ways. He called later that night to say good night.

Arthur McNamera was a friend of Keeley's. Since March 2009, McNamera lived in his motor home "just off" Keeley's property. McNamera said Keeley's property was unusual. It was approximately two acres and had a "cowboy motif." According to McNamera, Keeley collected "everything."

In August 2009, Keeley had a new light blue Hyundai. Keeley was very happy about it and bought it on August 8, 2009. The next day, McNamera saw Keeley with a woman in the driveway on Keeley's property. That night, at about 9:30 or 10:00 p.m., Keeley telephoned McNamera and informed McNamera he (Keeley) had a tow job

2

at 7:00 a.m., the next morning. Later that night, McNamera woke to the sound of Keeley's dogs barking. The barking was brief and stopped suddenly.

When McNamera woke up the next morning, he saw Keeley's tow truck in the yard. McNamera thought that was "kind of weird," so he walked around Keeley's property and noticed the new Hyundai was gone. McNamera guessed the job must have been canceled and Keeley had gone to breakfast. A few hours later, McNamera telephoned Keeley, but there was no answer. McNamera called again after running some errands. Keeley still did not answer his telephone.

McNamera saw a ladder leaning against the fence to Keeley's property and thought "that's not right." He walked to the back of Keeley's property, unlocked the back gate, and entered. When he approached the front of the residence, by the carport, McNamera noticed the door was open and the Hyundai was gone. The open door struck McNamera as strange because Keeley had three dogs and always left that door locked, unless he was working outside, in which case he put an iron shackle on the door to make sure it stayed closed. McNamera walked inside the residence. He saw clothes were all over the place, which was unusual. Keeley normally hung his clothing on a clothesline and then folded them. The dogs were inside the residence. McNamera closed and locked the door. Then he saw Keeley's body at the bottom of the bed in the cabana. Keeley was in his underwear. Based on the amount of blood, the fact that Keeley was not moving, and flies were coming out of Keeley's mouth, McNamera did not think Keeley was alive.

It was about 5:00 p.m. when McNamera found Keeley's body and then called 911. McNamera showed the law enforcement officers around the property. He said the inside of the house was in a state of disarray, "everything was pulled out and thrown around like somebody was looking for something; just dump stuff out and pull the cushions off the couch and whatever."

David Eichelt, a deputy sheriff with the Riverside County Sheriff's Department, responded to the scene. He said the property consisted of "a large fenced-in

3

acreage" with a 16-foot high iron gate. The property had a Western motif with wagon wheels, long-horn skulls, and old wagons on the property. The property had a number of outbuildings, including a barn. Additionally, there were a number of broken down vehicles on the property.

Eichelt went to what he described as Keeley's outdoor sleeping area with a free swinging bed suspended by four chains. Keeley was on his back on the ground. His feet were bound with a necktie. Another necktie was tied around Keeley's left wrist and there was a necktie by Keeley's neck. Keeley appeared to have defensive wounds on his right hand.

Blood splatters were around Keeley, including on his bed. Near Keeley was a buttstock of a shotgun with blood splatters on it. The weapon's forestock was found close to the buttstock. The rest of the shotgun was found on top of a dresser, covered by hangered clothing that had apparently been removed from the closet.

Deputies found "numerous holsters and scabbards for horseback purposes and rifle cases all around the residence and property itself." They did not find a corresponding weapon for each holster. Eichelt found two or three replica or inoperable guns in various states of disassembly.

Troy Dehart, Keeley's son-in-law, was familiar with the contents of Keeley's home. When he first saw Keeley's residence after Keeley died, it appeared as if it had been ransacked; tables were turned over, all the drawers were open. Even the couch had been turned over.

Dr. Joanna Young, the forensic pathologist for the Riverside County Sheriff's Department, performed the autopsy on Keeley's body. Young said Keeley's face was "fairly extensively damaged." He had multiple lacerations to both sides of his face and head, including large lacerations to both sides of his forehead, his nose, the top of his mouth, and his left ear. Both his eyes had been blackened, and his skull did not

4

appear to have its normal shape.  The bones of his lower face "were crushed."  Keeley also had defensive wounds on the back of one of his hands.

Upon further examination, the skull was found to have been fractured around the right ear.  When she examined Keeley's neck, Dr. Young found Keeley's hyoid bone at the top of his airway was fractured in two places and there had been hemorrhaging around the bone.  There was some petechiae—very small pinpoint hemorrhages—in the right eye.  The broken hyoid bone and the presence of petechiae are indicative of strangulation.  A toxicology screen performed on Keeley's blood indicated no alcohol or illicit drugs in his system.

Dr. Young concluded Keeley died "due to strangulation, with other significant conditions of blunt force head trauma."  Strangulation could have been caused by using a necktie or by someone using their hands.  The wounds to Keeley's face were inflicted before he died.  Those wounds are consistent with repeatedly being struck with the buttstock of a "long gun."

B. *Keeley's Hyundai is Found*

Dora Carter-Vinson lived in Desert Hot Springs in August 2009.[1]  Early one morning about 4:00 a.m., she and her husband woke up to what she thought was gunfire.  She said they were used to the sound of gunfire, but this time it sounded like it was closer to their house than normal.  They walked out onto their patio and, still hearing the "popping noises," called 911.  A minute or two later, the fire department and police responded.  When Carter-Vinson and her husband looked out of their backyard, they could see fire at the end of Two Bunch Palms, approximately a mile and a half from Keeley's property.

---

[1] The prosecutor asked where she lived in August 2010, but that appeared to be a slip of the tongue, given the charged incident occurred on August 9, 2009.

Detective Martin Alfaro responded to the scene of a car fire at Two Bunch Palms, about 40 to 70 yards from the Carter-Vinson residence. Keeley's Hyundai had been burned. About 15 to 20 yards from the scene, Alfaro found a blue Bic lighter. The lighter was not dirty or muddy and appeared to have been recently placed there.

C. *Search Warrants*

Detective Kenneth Patterson executed a search warrant for Cody's Desert Hot Springs residence on August 13, 2009. There was a three-wheel ATV in the garage. A Davis Industries Derringer was found hidden in the back of a large screen television in the master bedroom. The Derringer was loaded with "a CCI .38 caliber snake shot type of round."

Dehart said Keeley had a "snake gun," a Derringer, he used to deal with the snakes in the desert. Within a week of Keeley's death, Patterson asked Dehart to look at a Derringer. He recognized the Derringer as Keeley's, based on a scratch Dehart made on the handle the previous Thanksgiving. Shortly after identifying the Derringer as Keeley's, Dehart and Patterson went to Keeley's property and Dehart showed Patterson the end table where Keeley kept ammunition. Ammunition found in the end table was "the exact same" as the ammunition in the loaded Derringer found in Cody's residence.

The sheriff's department also executed a search warrant on Banister and April Morris's apartment in Desert Hot Springs. Inside the residence, deputies found a red trunk lined with newspapers. Dehart identified the trunk as Keeley's.

D. *April Morris*

Morris testified Banister, whose nickname is "Little Man," was her boyfriend. They lived together in Desert Hot Springs in August 2009. She said she spent August 9, 2009, at the Spa Casino and Banister stayed with her that night. He arrived at the Spa Casino at approximately 3:00 p.m. and did not leave.

6

Her testimony was impeached with statements she made to law enforcement in September 2009, when she returned to California after driving Banister to Tennessee. She told an investigator she had gone to a hotel with a friend, Tisha, and Tisha's daughter on August 9, 2009.

During questioning in September 2009, Morris said she rented a car and drove Banister to Rockwood, Tennessee, where his family lives. She said she spent the night of the killing at a The Spa and Casino in Palm Springs. Banister checked in with her, but he did not spend the night with Morris. She picked him up the next day from her residence in Desert Hot Springs and took him back to the casino. Morris said Banister was "being weird" when she picked him up. They gambled for a couple of hours and went to Morris's room. Morris kept asking Banister what was wrong and he kept denying anything was wrong. Finally, Banister said he "screwed up" and may have killed someone. He said he beat up someone, but does not know if he killed him or not. Banister told Morris that Cody was with him at the time of the incident. Morris told him she did not want to know.

Morris drove Banister to Tennessee three days after their apartment was searched. Banister said he wanted to see his family and did not want to spend the rest of his life in prison. Morris returned to California, but Banister stayed in Tennessee.

E. *Telephone Calls*

Three telephone calls Banister made from the Roane County jail in Tennessee were recorded. Inmates without enough money can make a call using their booking number as a PIN number. The female voice on two of the calls was Morris's. The third call was to Misty Camargo, Cody's girlfriend. During that call, defendant asked Camargo, where Morris was. Camargo said she had not spoken with Morris. During that call, Banister said " . . . I need to get hold of my bitch so I can find out what she said to 'em." Banister claimed someone "told on" him.

7

In one call to Morris, she told Banister the police knew where he was. He said he would tell the police his grandmother was sick. Morris told Banister that Cody had been arrested. In a second recorded telephone call, Banister asked if the Spa Casino had video cameras. Discussing an alibi, Banister wanted to know if anyone would be willing to say Morris and he had been watching a movie. Banister stated he would say they fell asleep watching the movie.

Cody's telephone calls from the Indio jail were recorded. In a call to Camargo, he said he had been told what Banister was saying and that it did not look good for him (Cody). The next day Cody called his mother. She suggested he tell his side of the story and he said he was facing life in prison because he "was there."

F. *Statements of Cody's Acquaintances*

Gabriel Contreras knows Alvin Hatley. On September 3, 2009, Contreras told Investigator Button he was speaking with Hatley three or four days earlier, when a person named Travis approached Hatley. Travis and Hatley walked approximately 10 feet away from Contreras and had a conversation. Contreras heard Travis say that he and "Little Man" beat up someone "really bad and left him in really bad shape." Travis said he hit the victim and he and Little Man had burglarized the same person's home before. Contreras said Travis and Little Man were always together and he only knew Little Man from seeing him with Travis.

Hatley testified Cody is like a brother to him. Hatley denied knowing Contreras and said he did not recall any conversation with Cody about Cody getting into trouble, Cody saying Little Man got into a fight and hurt the other person, denied knowing who Little Man is, and said he did not recall being interviewed by Button.

Button testified he interviewed Hatley within a week of interviewing Contreras. Button asked Hatley if he had a conversation with Cody after Keeley's death. Hatley said he did. In that conversation, Cody said he and his friend "did their thing," or

8

something to that effect. Cody said he got mixed up in something and could not go home.

In April 2010, Michael Madrid's girlfriend Amber Morast made contact with the Desert Hot Springs Police Department on his behalf. Madrid was in jail at the time. Morast set up a conversation at the jail between Madrid and Sergeant Gustavo Paiz. Madrid provided the sergeant information about a murder. Madrid testified, however, that he did not use Cody's name and the first time he ever saw Cody was when he (Madrid) started going to court on the present case.

Sergeant Paiz said he was contacted by Morast in April 2010. Morast said her boyfriend was in custody and wanted to give Paiz information about a homicide. Paiz went to the Indio County jail within a couple of days and spoke with Madrid, Morast's boyfriend. During the recorded interview, Madrid said it was "not cool" that an old man was killed for nothing. He said he was at a friend's house when he spoke with Cody about what had happened.

Cody told Madrid "they" had burglarized buildings on Keeley's property a couple of weeks before the murder, but this time they wanted to go into the residence. They intended on drugging the dogs, but it did not work. They forced their way into the residence and started rummaging through the house. They confronted Keeley and wanted to know where his valuables were. They ended up getting $400 and some guns. Madrid said "John" was the one that "smashed" Keeley with a gun and John fled to Tennessee where he was arrested. According to Madrid, Cody said things were not supposed to go that way it, but they got "carried away."

G. *Defense Evidence*

Brett McDonald has served four terms in state prison. He knows Banister and Morris, the mother of McDonald's oldest child. He said the trunk seized from Banister and Morris's apartment belongs to Morris and he helped her move the trunk on a

9

number of occasions before August 9, 2009. According to McDonald, Morris owned the trunk "for at least the last 10 years."

Banister testified he spent August 9, 2009, at the Spa Casino and hotel with Morris and did not kill Keeley. He denied telling Morris he had beaten up an old man. He said he went to Tennessee to see his grandmother because she had a heart attack, knee surgery, and a stroke. He felt if he did not go then, he would never get to see her again. When he asked Morris if the casino had cameras it was because, if it did, it would prove he was there that weekend.

Banister said the trunk taken from his apartment has been in Morris's family "for a while." He said it had belonged to her son.

## II

## DISCUSSION

A. *Prosecutorial Misconduct*

"[O]n claims of prosecutorial misconduct our state law standards differ from those under the federal Constitution. With respect to the latter, conduct by the prosecutor constitutes prosecutorial misconduct only if it "'""so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process."'"" [Citations.] By contrast, our state law considers it misconduct when a prosecutor uses "'""deceptive or reprehensible methods to attempt to persuade either the court or the jury."'"" [Citations.] . . . 'A defendant's conviction will not be reversed for prosecutorial misconduct' that violates state law, however, 'unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' [Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1070-1071.)

Cody contends prosecutorial misconduct denied him a fair trial and due process. Banister joins in Cody's argument. Cody cites to four alleged instances of misconduct and claims the cumulative effect of the misconduct requires reversal. The first occurred in the questioning of Hatley. The prosecutor called Hatley as a witness,

10

presumably because Hatley made pretrial statements to Investigator Button about statements Cody had made to Hatley. Hatley testified Cody was like a brother to him and he tried to keep Cody out of trouble. On cross-examination, Hatley said that when Cody would go over to his house, Cody did not talk to him about what he (Cody) was doing "on the streets." Hatley said, "that's none of my business." He added that in all the years he had known Cody, Cody did not go to him and talk about any trouble in which he may have been involved.

On redirect, the prosecutor asked Hatley how he could keep Cody out of trouble if Cody never discussed his problems with Hatley. Without objection, Hatley gave an answer that took up more than a half a page of the reporter's transcript: "Okay. [Cody]—when [Cody] came over, I talked to him all the time: [Cody] you need to better your life; [Cody] you need to go to church; [Cody] you need to do this; [Cody] you need to do that. . . . [¶] Whenever [Cody] come over to my house, I'm constantly telling him to do right, do right; that he's been *in an out of jail* and I don't want him to go back to jail for something stupid. I'm always telling him, 'Do right for yourself. Make sure you go to church. Do better for yourself.' [¶] I never gave him no—no wrong answer or try to go on the streets and do something bad or anything. He's always—in my point of view, he never did nothing bad, never. He was always a good kid. He comes over, he don't mess with nothing, he eats with us and all of that. I mean [Cody] never been like that." (Italics added.) It is the italicized language that is alleged to constitute misconduct.

"'It is, of course, misconduct for a prosecutor to "intentionally elicit inadmissible testimony." [Citations.]' [Citation.] Such misconduct is exacerbated if the prosecutor continues to attempt to elicit such evidence after defense counsel has objected. [Citation.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 960.) The record contains nothing to suggest the prosecutor knew Hatley was going to make the complained of statement in the middle of his answer. Consequently, responsibility for Hatley's statement cannot be laid at the feet of the prosecutor. Moreover, as the trial court noted, Hatley's answer was

11

nonresponsive to the prosecutor's question, another fact that militates against finding the answer was a consequence of prosecutorial misconduct. Additionally, there was no objection to the answer and when defense counsel later moved for a mistrial based on Hatley's answer, the court ordered the prosecutor not to argue to the jury about Cody having been in and out of jail. The court also offered to admonish the jury concerning Hatley's statement, but counsel apparently did not request an admonishment. The failure to object on prosecutorial misconduct grounds and request and admonishment forfeits the issue on appeal. (*People v. Hill* (1998) 17 Cal.4th 800, 820 [failure to object on prosecutorial misconduct grounds and to request admonishment generally forfeits issue].)

The second instance of alleged prosecutorial misconduct occurred during the prosecutor's examination of Morris. The prosecutor showed Morris a calendar containing Morris's handwriting. There was a notation on the calendar stating "Little man come home." The prosecutor asked Morris what the notation under August 9 meant. Morris said, "That's when [Banister] was supposed to come home from jail." Defense counsel objected without stating any grounds, and moved to strike the answer. The court found the prosecutor was to blame for the answer, sustained the objection, struck the answer, and admonished the jury to disregard the answer. The prosecutor subsequently stated he did not know Morris would say Banister was supposed to get out of jail that day because his information was Banister was released from prison in mid-July, not in August. The court stated Morris's answer caught everyone by surprise. Thus, it does not appear the prosecutor engaged in misconduct by intentionally eliciting inadmissible evidence. But even were we to assume misconduct on the prosecutor's part for asking Morris that question, it would be harmless given the court struck the answer and admonished the jury to disregard the answer. (*People v. Maciel* (2013) 57 Cal.4th 482, 541-542.) We have no reason to believe the jury did not abide by the admonishment.

The third instance related to Morris's testimony as well. Investigator Button testified he interviewed Morris on September 1, 2009, about where she was and

where Banister was at the time Keeley was killed. Button recorded the interview. A redacted version of the recorded session was played for the jury. Transcripts of the recording were provided to the jurors so they could follow along. On page 15 of the 84 page transcript, the following statement is attributed to Morris: "He's committed crimes before, stolen stuff." When the prosecutor was alerted to the existence of the statement in the transcript, he said the statement should be redacted because the statement is not in the portion of the tape played for the jury. He added that he provided defense counsel the transcript the day before to make sure nothing redacted from the tape was included in the transcript. Defense counsel did not disagree with the prosecutor's statement. When the court asked if defense counsel had read the remainder of the transcript, Cody's attorney said the evidence "pretty much did not pertain to [Cody]." Banister's counsel moved for a mistrial, arguing the inclusion of the statement in the transcript violated the court's ruling prohibiting the evidence of Banister's prior criminal behavior. Cody's attorney joined in the motion.

The court denied the mistrial motion and admonished the jury to disregard any statements in the transcript that were not contained in the recording. The admonishment cured the error.

The fourth incident occurred during the prosecutor's argument to the jury. The prosecutor told the jury: "Mr. Cody told [Hatley] that [he] and a friend went out and did their thing and then came back and they were crying about it. 'Their thing,' ladies and gentlemen, is what they did to Ed Keeley three weeks earlier. 'Their thing' was to go to other people's houses and get people's belongings and take them for their own." Banister's attorney objected, contending the argument misstated the evidence. The court then admonished the jury as follows: "Ladies and gentlemen, this is argument. When counsel is reciting what they think the evidence shows, if the—your impression of the evidence is different than counsel's, of course you have to go with what you feel the evidence shows rather than what counsel says it shows."

13

The court also denied Banister's motion for a mistrial because there was "some evidence Keeley's house was burglarized prior to this event." After discussing the contents of a curative instruction with defense counsel, the court admonished the jury: "there's no evidence that Mr. Banister or Mr. Cody committed burglaries against other people."

That admonishment had the furthest reaching curative effect. It amounted to a complete repudiation of the prosecutor's statement *by the court*. We think it very unlikely the jury ignored the court's strong statement condemning the prosecutor's argument.

We reject the defendants' cumulative prosecutorial misconduct argument. As Hatley's statement that Cody had been in an out of jail was not responsive to the prosecutor's question, the statement was not the result of any impropriety on the prosecutor's part. Neither was Morris's statement to the effect the entry on her calendar for August 9, 2009, the date of the murder, noted Banister returned home that day from jail. According to the prosecutor's information, Banister had been released from prison in mid-July.

That leaves but two instances of possible prosecutorial misconduct. Because both instances were cured with appropriate admonishments—the latter, in the most effective way possible, by informing the jury the prosecutor's argument was unsupported by the evidence—there is no cumulative effect requiring reversal.

B. *Banister's Statement Implicating Cody*

Prior to the introduction of evidence, the prosecutor made a motion to introduce the statements of the defendants against one another. At issue here, is the alleged statement of Banister to Morris the day after the murder, in which Banister said he had been with Cody the night before. Cody contends the trial court erred in admitting Banister's hearsay statement to Morris against him. Evidence Code section 1200

14

generally makes inadmissible out-of-court statements offered for their truth.

We review a trial court's decision for an abuse of discretion in admitting evidence alleged to be hearsay. (*People v. Alvarez* (1996) 14 Cal.4th 155, 203.) If a trial court abused its discretion, resulting in the admission of inadmissible hearsay, we reverse only if there is a reasonable probability the defendant would have received a more favorable result in the absence of the error. (*People v. Riccardi* (2012) 54 Cal.4th 758, 830.)

Even were we to find the Banister's statement to Morris was inadmissible hearsay as to Cody, a conclusion we do not make here (see *People v. Cervantes* (2004) 118 Cal.App.4th 162, 177 [statement of codefendant against his penal interest admissible against defendant if trustworthy]), any error in admitting the statement against Cody would have been harmless. Cody's own statements put him with Banister on the night of the murder. He told his mother he was facing life in prison because "he was there." Contreras heard Cody tell Hatley he and Banister beat someone "really bad and left him in really bad shape" and that he and Banister had burglarized the same person's home before. And while Cody was in jail, he told Madrid about his participation in the incident. Thus, Morris's testimony concerning Cody being with Banister on the night of the murder was merely cumulative.

C. *Sufficiency of the Evidence*

"'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We must accept all assessments of credibility made by the trier of fact and determine if substantial evidence exists to support each element of the offense. (See *People v. Carpenter* (1997) 15 Cal.4th 312, 387.) We presume in support

15

of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We may reverse for lack of substantial evidence only if "'"upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Cody does not challenge the sufficiency of the evidence to support his conviction for first degree murder, but he does challenge the sufficiency of the evidence to support the true finding on the special circumstance allegation. The special circumstances alleged the murder occurred during the course of a robbery and a burglary. The jury was instructed pursuant to CALCRIM No. 730 on the elements of the special circumstance. In order to find the special circumstance allegation true, the jury had to find Cody committed or attempted to commit a robbery and/or burglary; he intended to commit a robbery and/or burglary or intended to aid and abet the commission of a robbery and/or burglary; Cody did an act that caused the death of Keeley; and the robbery and/or burglary, as well as the act that caused Keeley's death, were part of one continuous transaction. (CALCRIM No. 730.)[2] Cody contends the evidence was not sufficient to support finding *he* did an act that caused Keeley's death.

According to Dr. Young, Keeley died "due to strangulation, *with other significant conditions of blunt force head trauma*." (Italics added.) The blunt force trauma referred to by Dr. Young included, "fairly extensive[]" damage to Keeley's face. "The bones of the lower face had been crushed." Additionally, Keeley had multiple lacerations to both sides of his face and head, including large lacerations to both sides of his forehead, his nose, the top of his mouth, and his left ear. Both his eyes had been

_____

[2] The jury was not instructed on the requirements for finding a special circumstance true as to one who did not kill, but who aided and abetted the underlying robbery and/or burglary. For the special circumstance to apply to such an aider and abettor, the defendant must have been a major participant in the crime and have acted with reckless indifference to human life. (§ 190.2, subd. (d); see CALCRIM No. 703.)

16

blackened, and his skull did not appear to have its normal shape. The injuries to Keeley's head were so significant, Young viewed Keeley's death as a "blunt force trauma case" and was surprised when she eventually found evidence of subsequent strangulation.

Although there was no evidence as to which of the defendants *strangled* Keeley, there was evidence both defendants inflicted the significant blunt force trauma that contributed to the death. The day after the murder, Banister told Morris he had "screwed up" and may have killed someone when he beat up the person. Contreras heard Cody (whom he referred to as Travis) say he and Little Man (Banister) beat up someone whose home they had burglarized and left the person in "really bad shape." Cody also told Madrid he and his confederate forced their way into the residence and confronted Keeley about the location of his valuables. Cody said things were not supposed to go the way things did, but they got "carried away."

The beating inflicted on the 75-year-old Keeley by the defendants and resulting in the significant blunt force trauma that accompanied Keeley's strangulation, supports the jury's determination that both defendants did an act that caused Keeley's death. Consequently, the evidence supports the special circumstance allegation.


D. *CALCRIM No. 703*

Banister and Cody each argue the trial court prejudicially erred in failing to instruct the jury pursuant to CALCRIM No. 703. That instruction pertains to liability for the special circumstance on the part of a nonkiller. It provides, consistent with section 190.2, subdivision (d), that the nonkiller is still subject to the special circumstance if he was a major participant in the crime and during that participation, and he acted with reckless indifference to human life. (CALCRIM No. 703.) A trial court has a sua sponte duty to give this instruction when the evidence does not preclude finding a defendant was not the actual killer. (*People v. Jones* (2003) 30 Cal.4th 1084, 1118.)

Because the jury could have found only one of the defendants strangled

17

Keeley and beat his head with the buttstock of the shotgun, the court should have instructed the jury pursuant to CALCRIM No. 703. The failure to so, however, is harmless "'only when, beyond a reasonable doubt, it did not contribute to the verdict.' [Citation.]" (*People v. Jones*, *supra*, 30 Cal.4th at p. 1119; see *Chapman v. California* (1967) 386 U.S. 18, 24.) The failure to provide the instruction in the present matter was harmless beyond a reasonable doubt. A jury instructed pursuant to CALCRIM No. 703, would not have reached a more favorable result for either defendant. (*People v. Carter* (2005) 36 Cal.4th 1114, 1187.) The defendants acted together in robbing Keeley and burglarizing his residence. They used a ladder to climb over the fence surrounding Keeley's property. They forced their way into his residence and confronted him about the location of his valuables. They then both proceeded to beat the 75-year-old Keeley. These actions reflect both defendants inarguably were major participants in the robbery and burglary, and at a minimum acted with reckless indifference to human life.

III

DISPOSITION

The judgments are affirmed.


MOORE, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.

18